Faht, Oireuit Judge,
sitting by designation, delivered the opinion of the court:
This is an action by a wife and her husband for just compensation claimed to be due by the United States for the taking of avigation easements over their land, consisting of two contiguous twenty acre tracts, referred to as the East and West tracts.[1] The land lies directly across a highway from the northeast-southwest runway of a military airfield in Yuma County, Arizona, operated by the United States Air Force.
Defendant acquiesces in the Commissioner’s finding and conclusion that an avigation easement was taken over the East tract and that plaintiffs are entitled to compensation therefor. The subject of the amount due is discussed at the end of this opinion.
*287 As to the West tract defendant, contrary to the views of the Commissioner, disputes plaintiffs’ right to recovery, even assuming an avigation easement was taken over that tract as well. Defendant’s position is that when plaintiffs acquired the claim for compensation arising out of the taking of this easement the six years statute of limitations, 28 U.S.C. § 2501 (Supp. V, 1958), had run against the claim, depriving this court of jurisdiction under settled law. Berry v. United States, 130 C. Cls. 33, 35, 126 F. Supp. 190, 192. Notwithstanding the equities in favor of plaintiffs, pointed out by the Commissioner, we are obliged to sustain the position of the defendant regarding the West tract for the reasons now explained.
The Commissioner concluded that defendant’s jet aircraft first started flying from the reactivated airfield in September 1951 with intent to continue to fly over the land at will, and that accordingly the taking then occurred. Plaintiffs contend the taking occurred in November 1951. The difference in these dates, insofar as the question of limitations is concerned, is immaterial; for plaintiffs did not acquire any claim for compensation for the taking within a period of six years from November 1951. The tract had been acquired on December 20, 1929, by Moses and Priscilla Belsley, the parents of plaintiff Veta B. Vroman. On November 19, 1954, Priscilla died intestate and her interests passed to Moses by operation of law. On January 25,1955, Moses, then about 83 years of age, executed a deed of the tract to his daughter, plaintiff Veta B. Vroman. The deed was duly recorded. The facts indicate that this conveyance might have been one of convenience only, for until Moses died December 30,1957, the daughter, although holding record title, really managed the land for her father. She began to exercise the full rights of owner only when he died leaving her as his sole heir and testamentary devisee and legatee. But even were she the real owner by reason of the 1955 deed, plaintiffs’ case would not be helped; for the deed did not carry with it a claim or right of action for compensation for the taking which occurred while the tract was owned by her mother and father. As the Commissioner correctly ruled, the interest in the claim “was a chose in action separate and *288 apart from the ownership of that parcel of land. United States v. Dow, [357 U.S. 17] * * *; Ferrell v. United States, 49 C. Cls. 222, 224 (1914); see Highland Park, Inc. v. United States, 161 F. Supp. 597, 600 (C. Cls., 1958).” [142 C. Cls.269] Plaintiffs’ claim for compensation for the taking of the easement over the West tract must accordingly be dismissed. This is so notwithstanding plaintiffs filed their action in this court in August 1957, within six years of the taking," for at that time they had no right of action and acquired none over which this court can assume jurisdiction when the father died more than six years after the United States took the easement during the time of the ownership of the land by him and his wife Priscilla. Berry v. United States, supra.
Plaintiffs are entitled to recover for the taking by the United States of an avigation easement over the East tract of their land just compensation in the amount of $2,500.00, with interest thereon at four percent per annum from September 1, 1951 to date of payment as part of just compensation, and judgment will be entered to that effect.
It is so ordered.
Laramore, Judge; Madden, Judge; Whitaker, Judge, and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the briefs and argument of counsel, and the report of Trial Commissioner Mastín G. White, makes the following findings of fact:
1. The plaintiffs, Gerald T. Vroman and Veta B. Vroman, are husband and wife, having been married since July 17, 1926. They are citizens of the United States and residents of the State of California.
2. On December 20, 1929, the plaintiffs acquired a parcel of land described as the east half of the southwest quarter of the southeast quarter of section 2, T. 9 S., R. 23 W., Gila and Salt River meridian, Yuma County, Arizona. The ownership of this parcel, consisting of approximately 20 acres, has been held by the plaintiffs continuously since the date mentioned. It is owned by the plaintiffs as community property.
*289 3. (a) On December 20, 1929, Moses Belsley and Ms wife, Priscilla Belsley, acquired as community property a parcel of land contiguous to that mentioned in finding 2. The parcel acquired by the Belsleys is described as the west half of the southwest quarter of the southeast quarter of section 2, T. 9 S., R. 23 W., Gila and Salt River meridian, Yuma County, Arizona. It consists of approximately 20 acres.
(b) Moses and Priscilla Belsley were residents of the State of California. They were the parents of the plaintiff Veta B. Vroman.
4. Priscilla Belsley died intestate on November 19, 1954. Up until the time of her death, the land mentioned in finding 3(a) was still owned by Moses Belsley and Priscilla Belsley as community property.
5. As of the date of Priscilla Belsley’s death, the only surviving child of Moses Belsley and Priscilla Belsley was the plaintiff Veta B. Vroman. Although other children had been bom to Moses Belsley and Priscilla Belsley, those children had died in infancy, leaving no issue.
6. Moses Belsley did not remarry after the death of Priscilla Belsley.
7. On January 25, 1955, Moses Belsley executed a deed conveying the W^SW^SE^ of sec. 2, T. 9 S., R. 23 W., Gila and Salt River meridian, to the plaintiff Veta B. Vroman as her sole and separate property. This deed was duly recorded. No money or other consideration was paid by Mrs. Vroman to Mr. Belsley for the property.
8. Moses Belsley signed a will on February 18,1955. The will, which had been prepared by an attorney in accordance with Mr. Belsley’s instructions and which was signed by Mr. Belsley with the necessary formalities, stated (among other things) that:
I hereby give, devise and bequeath all my property, real or personal, of whatever hind or character and wheresoever located, to my daughter, Veta B. Vroman.
9. Moses Belsley died on December 30, 1957. He left no wife, and his sole surviving child was the plaintiff Veta B. Vroman. (See findings 4-6.)
10. Moses Belsley’s will (see finding 8) had not been probated at the time of the trial in this case.
*290 11. (a) During the period between January 25,1955 (the date of the deed from Moses Belsley to Yeta B. Yroman) and December 30, 1957 (the date of Moses Belsley’s death), the plaintiff Veta B. Vroman managed the W%SW%SE% of sec. 2, T. 9 S., R. 23 W., Gila and Salt River meridian, by drawing checks on her father’s personal bank account to pay the tases and the other necessary expenses, and by depositing the income from the land (see finding 12) in her father’s personal bank account.
(b) Since December 30, 1957, the plaintiff Veta B. Vro-man has exercised on her own behalf the rights of ownership in the W%SW%SE% of sec. 2, T. 9 S., R. 23 W., Gila and Salt River meridian.
12. The E%SW%SE% and the W%SW&SE}4 of sec. 2, T. 9 S., R. 23 W., Gila and Salt River meridian, together comprise the SW}4SE%, a 40-acre tract that is 1,320 feet square, except that a 100-foot right-of-way has been taken along the southern boundary of the tract for U.S. Highway 80 and a 33-foot right-of-way has been taken along the western boundary of the tract for an irrigation ditch. The tract is located about 2 miles east and about 4 miles south of the city limits of Yuma, Arizona. The land, although desert in character, is irrigable, as the terrain is relatively level, the soil is fertile and arable, the area is within an irrigation district, and irrigation water is readily available for use on the land. The land and the climate are suitable for the growing of citrus fruits. However, the tract has never been cultivated, improved, or used in any way, except that the owners permitted the United States Army to use the land for a time during World War II at a nominal rental of $1 per acre per year, and an advertising billboard has been maintained in the southwest corner of the W)/2SW14SE'i/j, since sometime in the 1930’s, for which a rental of $36 per year was paid to Moses Belsley up until the time of his death and to the plaintiff Yeta B. Yroman since that time.
13. U.S. Highway 80, which forms the southern boundary of the SW%SE% of sec. 2, T. 9 S., R. 23 W., Gila and Salt River meridian, is the main highway between Phoenix, Arizona, and San Diego, California. It passes through *291 Yuma, Arizona, a few miles to the northwest of the SW44SE14 of section 2. The highway has a 200-foot right-of-way at the point where it passes the quarter-quarter-section that is involved in this litigation.
14. (a) The Vincent Air Force Base is situated directly across U.S. Highway 80 from the SW%SE% of sec. 2, T. 9 S., R. 23 W., Gila and Salt River meridian. The base is a large military airfield that is operated by the defendant through the United States Air Force.
(b) Some of the land within the exterior boundaries of the Vincent Air Force Base is owned by the defendant. The remainder is owned by Yuma County and is used by the defendant for military purposes with the permission of the county.
15. (a) There are three runways on the Vincent Air Force Base, i.e., a northeast-southwest runway, an east-west runway, and a north-south runway.
(b) The northeast-southwest runway is the main runway. It is approximately 9,600 feet in length, 150 feet wide, and paved with concrete. Extending beyond the concrete pavement at each end of the main runway, there is an additional area of rough asphalt paving. The northeast end of the concrete runway extends to within about 1,000 feet of the northern boundary of the Vincent Air Force Base, which is U.S. Highway 80. The rough 'asphalt paving at the northeast end of the runway extends from the concrete to a point that is within about 350 feet of U.S. Highway 80. The center line of the northeast-southwest runway, if extended to the northeast, would pass directly over the SW^SE^ of sec. 2, T. 9 S., R. 23 W., Gila and Salt River meridian, which is located just across U.S. Highway 80 from the Vincent Air Force Base.
16. The site of the Vincent Air Force Base has been used for airport purposes since 1926. Originally, and up until World War II, a civilian airport known as the Yuma County Airport was established and maintained there by Yuma County. Then, during World War II, the facility was operated jointly by the Army Air Forces and Yuma County as 'a combined military airfield and civilian airport. Its use as a military airfield was discontinued after the end of World *292 War II, but the operation of the Yuma County Airport for civilian aircraft continued. The military aircraft that flew to or from the facility during World War II, 'and the civilian aircraft flying to or from the airport at all pertinent times, were propeller-type planes. Propeller-type aircraft have used all three runways at the airport, including the northeast-southwest runway. Flights by propeller-type military and civilian aircraft to or from the northeast-southwest runway have not interfered substantially with the use and enjoyment of the SW14SE14 of sec. 2, T. 9 S., R. 28 W., Gila and Salt River meridian.
17. (a) In January 1951, while the Yuma County Airport was being operated exclusively by Yuma County as a civilian airport, the Board of Supervisors of Yuma County, at the request of the Civil Aeronautics Authority, enacted a zoning ordinance that affected all land within 2 miles of the airport landing area. The ordinance stated that it was enacted for the purpose of:
* * * promoting the health, safety and general welfare of the inhabitants of rom county, by preventing the creation or establishment of airport hazards, thereby protecting the lives and property of users of the Yuma County Airport and of occupants of lands in its vicinity and preventing destruction or impairment of the utility of the Airport and the public investment therein * * *.
(b) The term “airport hazard” was defined in the ordinance of January 1951 as follows:
* * * any structure or tree or use of land which obstructs the airspace required for the flight of aircraft in landing or taking-off at the airport or is otherwise hazardous to such landing or taking-off of aircraft.
(c) All land within 2 miles of the airport landing area was divided by the ordinance of January 1951 into airport approach zones, airport turning zones, and airport transition zones. The SWI4SE14 of sec. 2, T. 9 S., R. 23 W., Gila and Salt River meridian, was included within an airport approach zone.
(d) The ordinance of January 1951 prohibited the erection or maintenance on the SW%SE}4 of sec. 2, T. 9 S., R. 23 W., Gila and Salt River meridian, of any structure *293 or other object which extended into the air above a maximum height that varied from approximately 12 feet at the southwest comer of the tract to about 85 feet 'at the southeast corner, and from about 35 feet at the northwest comer of the tract to about 60 feet at the northeast comer.
(e) The ordinance of January 1951 remained in effect until it was superseded in August 1953 by another county zoning ordinance, which greatly reduced the maximum heights limiting structures or other objects that might be erected or maintained on the SW14SE14 of sec. 2, T. 9 S., It. 23 W., Gila and Salt Biver meridian.
18. A military airfield was reactivated at the Yuma County Airport by the United States Air Force effective June 7, 1951. Arrangements were made by the Air Force with Yuma County for the joint operation of the facility as a military airfield and civilian airport.
19. Sometime between June 7,1951 and September 1,1951, it was decided by the Air Force that its reactivated military airfield at the Yuma County Airport would be tried out as a weapons training center for jet-aircraft personnel, and that if its use for that purpose should prove to be satisfactory, the installation would be permanently designated as a weapons training center for jet-aircraft personnel. Pursuant to such determination, a number of jet aircraft arrived at the reactivated military airfield on or about September 1, 1951 for weapons training purposes. The use of the military airfield at the Yuma County Airport as a weapons training center for jet-aircraft personnel thereafter continued on a trial basis until November 1951, when, the installation having proved to be satisfactory for such use, the Air Force permanently designated it as a weapons training center for jet-aircraft personnel.
20. The military airfield at the Yuma County Airport has been used continuously by the defendant as a weapons training center for jet-aircraft personnel since on or about September 1,1951. This has involved regular and frequent flights by jet aircraft to and from the airfield. The types of jet aircraft using the airfield have been the F-84, F-94, T-33, F-89, B-57, F-86, and F-90.
*294 21. The reactivated military airfield at the Yuma County Airport was officially named the Vincent Air Force Base effective September 1, 1956. (The term “Vincent Air Force Base” will be used when referring to this military airfield in subsequent findings, irrespective of whether a particular reference relates to a time before or after September 1, 1956.)
22. During the first year or so after September 1, 1951, all three runways at the Vincent Air Force Base were used by jet aircraft flying to or from the base, but the northeast-southwest runway (see finding 15(b)) was the one principally used during the early period. As time passed, the use of the north-south and the east-west runways by jet aircraft became less frequent and the use of the northeast-southwest runway became more frequent, with the result that, since about 1954, approximately 98 percent of the jet aircraft flying to or from the Vincent Air Force Base have used the northeast-southwest runway.
23. During the May-August period each year, most of the aircraft takeoffs from the northeast-southwest runway at the Vincent Air Force Base are toward the southwest, and most landings on this runway are from the northeast. During the remainder of each year, most of the aircraft takeoffs from the northeast-southwest runway are toward the northeast, and most of the landings on this runway are from the southwest.
24. (a) Throughout the period since September 1, 1951, jet aircraft of the defendant have passed over the SW^SEhi of sec. 2, T. 9 S., B. 23 W., Gila and Salt Biver meridian, at relatively low altitudes immediately prior to landing from the northeast on the northeast-southwest runway at the Vincent Air Force Base, and immediately after taking off toward the northeast from the northeast-southwest runway.
(b) In flying over the SW14SE14 of sec. 2, T. 9 S., B. 23 W., Gila and Salt Biver meridian, immediately prior to landing from the northeast on the northeast-southwest runway at the Vincent Air Force Base, jet aircraft are, on the average, somewhere between 75 and 125 feet above the ground.
*295 (c) In. flying over tire SW%.SEi4 of sec. 2, T. 9 S., R. 28 W., Gila and Salt River meridian, immediately after taking off toward the northeast from the northeast-southwest runway at the Vincent Air Force Base, jet aircraft are usually about 300 feet above the ground.
25. When jet aircraft of the defendant fly over the SW^SEi/^ of sec. 2, T. 9 S., R. 23 W., Gila and Salt River meridian, immediately after taking off toward the northeast from, or immediately prior to landing from the northeast on, the northeast-southwest runway at the Vincent Air Force Base, they make a loud, whining noise and they cause a terrific turbulence in the air. The noise is so loud that ordinary conversation is impossible, and the turbulence and resulting vibration are so great that damage would probably result to any ordinary structure that might be erected on the tract. These conditions have interfered substantially with the use and enjoyment of the SW^SE1/^ of sec. 2, T. 9 S., R. 23 W., Gila and Salt River meridian, since on or about September 1,1951.
26. (a) Just before September 1951, when regular and frequent flights by jet aircraft of the defendant at relatively low altitudes over the SW^SE^ of sec. 2, T. 9 S., R. 23 W., Gila and Salt River meridian, began to interfere substantially with the use and enjoyment of the property, the highest and best use of this tract was for the production of agricultural crops, including citrus fruits. The particular area was in the economic doldrums from the time of the closing of the military airfield at the Yuma County Airport after the end of World War II until the full effect of the reactivation of the Vincent Air Force Base was felt some months after September 1951. Because of this economic condition, and also because of the existence of the county zoning ordinance (see finding 17), there was little demand in the particular area just before September 1951 for property to be used for commercial, industrial, residential, or other nonagricultural purposes.
(b) The fair market value of the Ei/^SW^SE^ of sec. 2, T. 9 S., R. 23 W., Gila and Salt River meridian, for agricultural use just before September 1951 was $4,000; the fair *296 market value of the W^SW^SE^ for agricultural use at the time mentioned was $3,000; and the fair market value of the SWVtSE1^, as a unit, for agricultural use at the time mentioned was $8,000.
27. (a) The highest and best use of the SW%SE% of sec. 2, T. 9 S., E. 23 W., Gila 'and Salt Eiver meridian, just after regular and frequent flights by jet aircraft of the defendant iat relatively low altitudes over the tract began to interfere substantially with the use and enjoyment of the property was for the production of agricultural crops, including citrus fruits. However, the use of the tract for agricultural purposes would then have been much more difficult and much less pleasant than it would have been prior to the beginning of such flights by jet aircraft.
(b) The fair market value of the Ei^SW^SE^ of sec. 2, T. 9 S., E. 23 W., Gila and Salt Eiver meridian, for agricultural use at the time mentioned in paragraph (a) of this finding was $1,500; the fair market value of the W^SW^SE^ for agricultural use at such time was $1,350; and the fair market value of the SW14SE14, as a unit, for agricultural use at such time was $2,850.
28. Property in the particular area, including the SW14SE14 of sec. 2, T. 9 S., E. 23 W., Gila 'and Salt Eiver meridian, began to appreciate in value some months after September 1951. For example, the evidence indicates that in November 1952 the E%SW!4SE!4 of section 2 had a fair market value of $15,000, despite the flights by jet aircraft over the tract. The reactivation of the Vincent Air Force Base, the effect of which was then being felt to a substantial degree in the economy of the community, was at least a factor in this increased valuation of the EI/2SW14SE14 0f section 2. It also appears that the fair market value of this parcel persisted at the $15,000 level in 1957.
29. The plaintiffs have not received any compensation from the defendant for the damages sustained as a result of the regular and frequent flights by jet aircraft of the defendant at relatively low 'altitudes 'above the SW^SEi^ of sec. 2, T. 9 S., E. 23 W., Gila and Salt Eiver meridian, beginning on or about September 1,1951.
*297 CONCLUSION OF LAW
Upon the foregoing findings of fact, which, are made a part of the judgment herein, the court concludes as a matter of law that plaintiffs are not entitled to recover for the taking of an avigation easement over the West tract and their petition as to that part of their claim will be dismissed, and it is further concluded that plaintiffs are entitled to recover for the taking of an avigation easement over the East tract and it is therefore adjudged and ordered that they recover of and from the United States in the amount of two thousand five hundred dollars ($2,500), plus interest at four (4) percent per annum from September 1, 1951, to date of payment, all as part of just compensation, subject to the execution of a deed conveying to defendant a perpetual easement of flight by defendant for its planes over plaintiffs’ East tract at elevations above 75 feet.

 Specifically, the Sw%SE%, the 40 acre tract, consists of the Ey2Sw%SE%, the East tract, and the W%Sw%SE%, the west tract, of sec. 2, T. 9 S., R. 23 W., Gila and Salt River meridian.