UNITED STATES of America,
Plaintiff-Appellant and Cross-
Appellee,

v.

George C. DINERSTEIN, doing business
as Associated Electronics Company, and
Harvey B. Levy, Defendants-Appellees
and Cross-Appellants.

No. 292, Docket 29395.

United States Court of Appeals
Second Circuit.

Argued April 26, 1966.

Decided June 28, 1966.

David L. Rose, Atty., Dept. of Justice, Washington, D. C. (John W. Douglas, Asst. Atty. Gen., and Alan S. Rosenthal, Atty., Dept. of Justice, Washington, D. C., and Joseph P. Hoey, U. S. Atty., for the Eastern Dist. of New York, on the brief), for plaintiff-appellant.

Vincent J. Crowe, and Morris K. Siegel, of Siegel & Crowe, New York City, for defendant-appellee Dinerstein.

Liebowitz, Deixel & Brodsky, New York City, Leonard Brodsky, New York City, of counsel, for defendant-appellee and cross-appellant, Harvey Levy.

Before SMITH, KAUFMAN and FEINBERG, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge:

The United States appeals, and George C. Dinerstein, doing business as Associated Electronics Company, cross-appeals, from a judgment after trial in the United States District Court for the Eastern District of New York before Judge Dooling, sitting without a jury.[1] Judgment was for defendants Dinerstein and Levy on the government's claim for a $68,000 forfeiture, and for the government against Dinerstein individually for $4000 and against Dinerstein and Levy for $2000. 226 F.Supp. 368. We affirm that part of the judgment holding Dinerstein liable for $4000 and $2000, and reverse on the government's appeal.

The action was brought by the United States pursuant to § 19(c) of the Contract Settlement Act of 1944, 58 Stat. 667, 41 U.S.C. § 119,[2] for recovery of civil penalties for fraudulent claims in securing payment for terminated government war contracts. Dinerstein was a contractor, and Levy his accountant for some, but not all of the period in question. On June 6, 1946, Dinerstein was awarded nine contracts for the preparation of technical manuals for the Army Transportation Corps, five of which are relevant here. Each of the five contracts contained a termination clause providing that in the event the government terminated it would pay at the contract price for articles already delivered and accepted, and at cost, plus certain charges, including 6% (profit), for other terminated work, unless the parties agreed otherwise. The total contract price of all five contracts was $109,200.

On July 23, 1946, the parties agreed to a Supplement to the contracts covering partial payments. Payments so made were not to exceed 75% of cost, or 80% of the allocable contract price. Dinerstein promptly requested a partial payment of $21,840, and on August 2 he sent invoices as to this request showing that the request was based on a calculation of the percentage of the contract completed [20%] multiplied by the contract price. On August 9 the government returned the request, and advised that invoices must be based on cost. Dinerstein then resubmitted his request in the same amount, along with invoices on the surface based upon cost.

Before this request could be paid, however, the government, on August 28, terminated all five contracts. The supplemental agreement concerning partial payments was thus ended, and partial

---

1. The cross-appeal of defendant Harvey B. Levy was dismissed by stipulation.

2. § 119. Fraudulent claims, vouchers, statements, etc.; jurisdiction

Every person who makes or causes to be made, or presents or causes to be presented to any officer, agent, or employee of any Government agency any claim, bill, receipt, voucher, statement, account, certificate, affidavit, or deposition, knowing the same to be false, fraudulent, or fictitious or knowing the same to contain or to be based on any false, fraudulent, or fictitious statement or entry, or who shall cover up or conceal any material fact, or who shall use or engage in any other fraudulent trick, scheme, or device, for the purpose of securing or obtaining, or aiding to secure or obtain, for any person any benefit, payment, compensation, allowance, loan, advance, or emolument from the United States or any Govern-

ment agency in connection with the termination, cancellation, settlement, payment, negotiation, renegotiation, performance, procurement, or award of a contract with the United States or with any other person, and every person who enters into an agreement, combination, or conspiracy so to do, (1) shall pay to the United States an amount equal to 25 per centum of any amount thereby sought to be wrongfully secured or obtained but not actually received, and (2) shall forfeit and refund any such benefit, payment, compensation, allowance, loan, advance, and emolument received as a result thereof and (3) shall in addition pay to the United States the sum of $2,000 for each such act, and double the amount of any damage which the United States may have sustained by reason thereof, together with the costs of suit.

\*　　　\*　　　\*　　　\*　　　\*

payments were henceforth governed by § 9 of the Act, 58 Stat. 657, 41 U.S.C. § 109. Dinerstein submitted a request for partial payment under that section, which permits the contracting agency to make such payments "upon such conditions as it deems necessary * * *." Dinerstein's request, dated September 13, was for $15,000. Evidently the government required a cost basis, rather than a percentage completion basis. Compare 41 C.F.R. § 1–8.212–1(b) (3) and (4). Accordingly, Dinerstein said that $19,854.53 was the best estimate of costs incurred to date. The contracting agency allowed the request, and paid Dinerstein $15,000. That amount is just over 75% of $19,854.53. It may have been that the agency had a 75% of cost rule under § 9 just as in the supplemental agreement. See Regulations cited supra.

On September 16, Dinerstein made another application for a partial payment, this time for $46,425.00. His best estimate of costs incurred to that date [including the $19,854.53] was $81,900, 75% of which was $61,425. Taking from this the $15,000 already paid left the amount of this request. The agency paid $42,330. Dinerstein had computed his costs by calculating that the contracts were 75% completed, and asserting that his costs were 75% of the contract price; the agency concluded that the contract was only 70% completed,[3] and, for the second payment, allowed 75% of 70% of the contract price, less the $15,000 already paid. In other words, in calculating the second payment, the government evidently worked on a percentage completion basis, even though it supposedly required a cost basis.

On December 21, Dinerstein sought final payment of $40,197.48, based on a calculation that at termination the contracts were, on average, 89.3% completed.[4] The agency advised that a cost estimate was required, and on February 10, 1947, Dinerstein submitted an estimate of total costs of $97,496.94, only $30 less than 89.3% of the contract price. On March 20 Dinerstein offered to settle on the basis of $94,917.33, less amounts already paid; this figure included $4500 settlement costs [see 41 U.S.C. § 106(d) (3)]. In so doing he stated to the agency that the facilities of Associated were exclusively devoted to the five contracts during July and August until the termination, that as of termination work was 89% completed, and that the costs incurred consisted of the following: direct labor costs, $15,989.70; material and services, $24,221.49; other costs, selling and administrative expenses, and overhead, $19,112.13; and pre-contract costs, expected profit, and anticipated additional compensation due employees, $35,594.00. In fact there were forty jobs being done by Associated during July and August, and direct labor costs allocable to the five contracts were only $746.02.

The government conducted a Negotiation Audit in connection with the offer of settlement. The result was a recommendation that $21,812.03 of material and service costs be accepted; that $487.26 of such costs and $10,271.89 of general and administrative costs, as well as $3000 of the $4500 settlements costs, be rejected, and that the remainder (about $60,000) be further considered. The auditor found the records of Associated to be very scant and not entirely to be relied on.

On May 2, 1947, the parties conducted a six hour negotiation, and agreed to a settlement figure of $70,846.15. The Settlement Review Board [41 U.S.C. § 106(c)] approved, and the government paid Dinerstein the remaining amount, $13,516.15.

Apparently no job cost records were kept by Associated before August 1946,

---

3. It was asserted that the 70% completion figure, approved for the government by one Louis Fragala, also named as a defendant, was excessive, and that the actual percentage was much smaller. The only proof offered as to actual percentage completion was the evidence of costs incurred.

4. This was also said to have been a distortion.

when the jobs concerned here were terminated. Although the employees kept time cards showing how much time was spent on each job, this data, or a synthesis of it, was not available to the negotiation auditor. But in 1958, while going over records in Dinerstein's possession in connection with an audit concerning other contracts, an auditor for the government examined such a synthesis, "weekly [labor] cost distribution sheets," from which the auditor concluded that the labor costs allocable to the five contracts was only $746.02, and that the figure Dinerstein submitted, $15,989.70, was the labor cost of all jobs done by Associated at its plant. This was the only direct evidence of costs. The auditor in 1958 concluded that the total costs on the five contracts were $2927.02, by adding to the $746.02 for direct labor, a proportional amount for indirect labor and for general costs, and $585 for material and services, being 20% of the total, paid to a subcontractor under a contract for services, and 10% of costs excluding profit, for profit.

The complaint of the United States asked for judgment in the amount of statutory penalties and double the difference between $70,846.15, the amount of the settlement, and the amount of actual costs, said to be around $2000. The District Court found that the claims Dinerstein made were knowingly false and fraudulent, and allowed a recovery of $2000 for each of two fraudulent claims, against Dinerstein, and $2000 for another, against Dinerstein and Levy. The court denied any other recovery on the theory that reliance had to be proven for the government to recover the payment received as a result of the false claims, and it had not proved reliance on defendants' false claims, but had instead paid out sums relying on its own determinations. On its appeal, the United States does not press its claim for double damages under the statute, and asks only that the judgment be reversed with directions that the District Court award it the recovery sought under § 119(2), providing for a single recovery.

The statute sued under, 41 U.S.C. § 119, contains three provisions for liability. A person who knowingly makes a false claim, or conceals a material fact or uses a fraudulent device in securing or obtaining or seeking to secure or obtain, payment on a government contract "(1) shall pay to the United States an amount equal to 25 per centum of any amount thereby sought to be wrongfully secured or obtained but not actually received." Such a person "(2) shall forfeit and refund any such * * payment * * * received as a result thereof." And he "(3) shall in addition pay to the United States the sum of $2000 for each such act, and double the amount of damage which the United States may have sustained by reason thereof * * *." The District Court held that it was necessary to show reliance to recover under (2). We conclude that this was error, and remand for further proceedings as to the liability of Dinerstein, other than for the $2000 penalties, as to which we affirm.

The District Court concluded that although reliance need not be shown to recover the $2000 penalties, a conclusion with which we agree, it was required to recover under § 119(2), because that part of the statute allows recovery only of the amount "received as a result" of the false claim or statement. Apparently admitting that this is the literal meaning of the statute, the United States asks in effect that the "result" language be read out of the statute because as read the statute frustrates the purpose of the Act and produces an absurd or unreasonable result. United States v. American Trucking Associations, 310 U.S. 534, 543, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940). While we agree that to require reliance produces an unreasonable result, we do not agree that the "result" language must be ignored to avoid a reliance requirement.

As read by the District Court, § 119 (2) largely overlaps the double damage portion of § 119(3), leading, in effect, to a triple damage provision. We should prefer a construction which leaves to

each element of the statute a function in some way different from the others.[5] Moreover, as read by the District Court, the contractor whose false claim is rejected and who receives no payment, or only part payment, is liable for 25% of any amount sought to be wrongfully secured but unpaid; but the contractor whose identical claim is paid without reliance is liable, under the reading of the District Court, for only $2000 penalties.[6]

In holding that reliance need not be shown under § 119(2) we do not read out of the statute the "result" language, because an essential function is still served by those words. They limit the government's recovery to that portion of the total payment not properly due. Here it limits the government to a *maximum* of about $68,000, rather than allowing a recovery of $70,846.51. In short, we read § 119(2) as not requiring proof of reliance or causation. The function of "as a result thereof" referring to the false claim is solely to limit the forfeiture to that portion of the payment not properly due, and we hold that its purpose is not also to insert a reliance or causation requirement. In view of this, it is unnecessary to decide whether reliance was shown here.

█ Dinerstein claims on cross-appeal that the action should have been dismissed because of a release in the settlement agreement. The release stated that "all rights and liabilities of the parties under the Contract and under the Act, insofar as it pertains to the Contract, shall cease forthwith * * *." Section 6(c) of the Act, 41 U.S.C. § 106

(c), provides that a settlement is "final and conclusive except * * * (2) for fraud * * *." Dinerstein argues that what is mean by fraud is common law deceit, so that whether or not reliance must be shown under § 119, it must be shown or the release is effective. In our view "fraud" in § 106(c) includes "fraudulent * * * statement[s]" and "fraudulent trick[s]," as used in § 119, and contemplates that a settlement may not release the contractor from liability under § 119. Furthermore, § 19 of the Act is entitled in the Statutes at Large "Preservation of Records; Prosecution of Fraud," and § 19(c) (41 U.S.C. § 119) is described in the margin as "Penalties for fraud." 58 Stat. 667.

█ Dinerstein also claims that the conclusion of Rood, the government witness who audited his records in 1958, that the total cost under the contracts, excluding profit, did not exceed $2661.02, was utterly fantastic and demonstrably false. In affirming the $2000 penalties it is only necessary to observe that there was ample evidence that Dinerstein falsely stated that the facilities of Associated were exclusively devoted to the five contracts in July and August, 1946, and falsely claimed direct labor costs of $15,989.70 in negotiating the 1947 settlement, when actually such costs were $746.02.

We have examined the other points raised by the parties and find them without merit or unnecessary to be treated now.

The judgment of the District Court is affirmed as to the $2000 penalties, and

---

5. Dinerstein has not argued that the construction urged by the government leads to treble damages when reliance is shown. We do not decide whether (2) is not available when reliance is shown, nor do we express any opinion on the scope of "damages" under (3). It is sufficient, to establish that each portion of the statutes serves a different function, to observe that under (3), unlike (2), there must be a showing of reliance, for the United States can only recover double the amount of damages "sustained by *reason*" of the false claim. It is significant that Congress used this language, instead of the "result" language employed in (2).

6. We read the government's brief as suggesting that (1) subjects to liability only a contractor who was not paid. In our view the contractor (such as Dinerstein) who submits a false claim, and is paid, but not in full, is liable for 25% of the amount not paid, if that amount was falsely claimed. This reading of (1) somewhat reduces the disparity between (1) and (2), at least where the contractor is not paid his whole claim, and the part unpaid was falsely claimed.

reversed on the appeal of the United States. The matter is remanded for further proceedings. Since under the District Court's theory of the case finding the precise amount of actual costs was unnecessary for the decision, we do not preclude the court from re-examining actual costs on remand, so as to arrive at the forfeiture.