737 F.2d 263
 222 U.S.P.Q. 766
 UNITED STATES OLYMPIC COMMITTEE, Plaintiff-Appellee,
v.
INTELICENSE CORPORATION, S.A., International Sports
Marketing, Inc., Defendants-Appellants.
INTERNATIONAL SPORTS MARKETING, INC., INTELICENSE, S.A.,
Plaintiffs-Appellants,
v.
UNITED STATES OLYMPIC COMMITTEE, Defendant-Appellee.
 Nos. 1324, 1331, Dockets 83-9025, 83-9063.
 United States Court of Appeals,
Second Circuit.
 Argued May 30, 1984.
Decided June 18, 1984.
Certiorari Denied Nov. 5, 1984.
See 105 S. Ct. 387.
 
 Peter F. Langrock, Langrock, Sperry, Parker & Wool, Middlebury, Vt., for defendants-appellants.
 Robert D. Rachlin, Downs, Rachlin & Martin, Burlington, Vt., for plaintiff-appellee; Richard G. Kline, Edward T. Colbert, Joseph D. Lewis, Beveridge, DeGrandi & Kline, Washington, D.C., of counsel.
 Before FEINBERG, Chief Judge, KAUFMAN and PIERCE, Circuit Judges.
 IRVING R. KAUFMAN, Circuit Judge.
 
 
 1
 We are asked today to decide whether the five-ring Olympic symbol can be commercially marketed within the United States without the consent of the United States Olympic Committee (USOC). While the roots of the Olympic Games can be traced to the first Olympiad held in Ancient Greece in 776 B.C., the temporal spectrum necessary to resolve this dispute is far more modest, extending over the six-year period since the promulgation of the Amateur Sports Act of 1978 (the "Act"), 36 U.S.C. Secs. 371-96. The fundamental purpose of that Act was to safeguard the USOC's ability to raise the financial resources that are a critical component of America's capacity to send world-class amateur athletes into international competition without the massive government subsidies enjoyed by competitors from other nations.
 
 
 2
 In view of the language and purpose of 36 U.S.C. Sec. 380 (Sec. 380), we hold that the USOC's consent is a prerequisite to marketing the Olympic symbol in the United States. Because appellant Intelicense Corp. (Intelicense) failed to secure USOC permission, we affirm the judgment of the district court enjoining Intelicense from commercially using the Olympic symbol in this country. We shall first set forth those facts pertinent to an understanding of this dispute and then proceed to discuss Intelicense's numerous legal arguments.I
 
 
 3
 This case concerns the right of Intelicense, a Swiss corporation, and its sublicensee, International Sports Marketing, Inc. (ISM), a Vermont corporation, to use, market, and sublicense within the United States the official pictograms of the International Olympic Committee (IOC) without the consent of the USOC. The pictograms at issue are graphic designs of athletes participating in various summer and winter Olympic sports against a backdrop that explicitly incorporates the Olympic symbol, consisting of five interlocking rings.
 
 
 4
 In October of 1979, Intelicense entered into two agreements with the IOC. Under these agreements, Intelicense was granted the exclusive worldwide rights to be the marketing agent for the pictograms, acquiring 60% of the licensing revenues while the IOC would receive 40%. Moreover, as a prerequisite to marketing the pictograms in the territory of each National Olympic Committee (NOC), the agreements provided that Intelicense must first secure the approval of each NOC.
 
 
 5
 Over the course of the following year, Intelicense affirmatively sought to obtain this approval from the USOC. Negotiations between Intelicense's director, Stanley Shefler, and the USOC's Chief Executive Officer, Colonel F. Don Miller, however, failed to provide an accord. At trial, Colonel Miller testified that the Intelicense proposal for marketing the pictograms would "dilute the market in terms of the USOC's obtaining corporate sponsors" and would expressly contravene the USOC's money-making activities that are critical to the continued existence of the United States Olympic team. Accordingly, the USOC unequivocally refused to consent to Intelicense's proposal. Nevertheless, Intelicense proceeded to license the use of pictograms on products marketed in the United States. This prompted the USOC to file suit[1] in 1982, demanding that Intelicense and its licensees cease and desist from contacting corporate sponsors in the United States.
 
 
 6
 Circuit Judge Oakes, sitting by designation in the district court, permanently enjoined Intelicense from using the Olympic symbol for the purposes of commercial trade within the United States, without the consent of the USOC. He concluded that Intelicense's failure to secure the consent of the USOC expressly contravened Sec. 380, as well as the 1978 version of the IOC charter, each of which requires USOC approval as a prerequisite to marketing or licensing any Olympic emblems or symbols in this country.
 
 
 7
 On appeal, Intelicense and ISM raise a litany of claims in an attempt to evade the strictures of Sec. 380. As we will explain, however, their efforts at statutory and semantical legerdemain are unsuccessful.
 
 II
 
 8
 An understanding of this case is predicated largely upon a complete appreciation of the language and purpose of The Amateur Sports Act of 1978.[2] This statute, enacted in 1978, empowers the USOC to exercise exclusive jurisdiction over all matters pertaining to the participation of the United States in the Olympic Games. The Act further vests the USOC with the responsibility of financing the participation of the United States in the Olympic Movement. Because the USOC is the only NOC that does not receive formal financial assistance from the Government, financing the United States Olympic team poses unique obstacles. Consequently, the marketing of the Olympic symbol in the United States assumes great importance.[3] Protecting the value of the Olympic symbol was, therefore, a significant factor that led to passage of the Act. See 124 Cong.Rec. H10,754 (daily ed. Sept. 26, 1978) (remarks of Rep. Danielson).
 
 
 9
 The relevant portions of Sec. 380 so essential to a determination of this case follow:
 
 
 10
 (a) Without the consent of the [USOC], any person who uses for the purpose of trade, to induce the sale of any goods or services, or to promote any theatrical exhibition, athletic performance, or competition--
 
 
 11
 (1) the symbol of the IOC, consisting of five interlocking rings; or ...
 
 
 12
 (3) any trademark, trade name, sign, symbol, or insignia falsely representing association with, or authorization by, the IOC or the [USOC] ...
 
 
 13
 shall be subject to suit in a civil action by the [USOC] for the remedies provided in the ... Trademark Act.
 
 
 14
 It is clear that the Congressional intent in enacting Sec. 380 was to promote the United States Olympic effort by entrusting the USOC with unfettered control over the commercial use of Olympic-related designations. This would facilitate the USOC's ability to raise those financial resources from the private sector that are needed to fund the United States Olympic Movement. One court has reasoned that a primary purpose of Sec. 380 was "to insure the market value of licenses." Stop the Olympic Prison v. United States Olympic Committee, 489 F.Supp. 1112, 1120 (S.D.N.Y.1980). The trial court here agreed, as has each court to have passed on the intent of Sec. 380. See International Sports Marketing, Inc. v. International Olympic Committee, and United States Olympic Committee, No. 83-44 (D.Vt.1983); United States Olympic Committee v. Union Sport Apparel, 220 U.S.P.Q. 526 (E.D.Va.1983); International Olympic Committee v. San Francisco Arts and Athletics, 219 U.S.P.Q. 982, (N.D.Cal.1982), aff'd, 707 F.2d 517 (9th Cir.1983); United States Olympic Committee v. International Federation of Body Builders, 219 U.S.P.Q. 353 (D.D.C.1982); United States Olympic Committee v. David Shoe Co., Inc., No. C-1-82-596 (S.D.Ohio 1982).
 
 
 15
 Because Sec. 380 is phrased disjunctively, a violation of any subsection properly animates the statute's panoply of remedial provisions. Intelicense claims, however, that because it is not falsely associated with the IOC, its conduct falls outside the proscriptive ambit of subsection (a)(3) and, therefore, cannot be reached by the remaining provisions of Sec. 380. But, such a construction constitutes a patent misreading of the statute and would render Sec. 380(a)(1), as well as the other subsections, superfluous. The view urged is contrary to this Circuit's established rules of statutory construction. See Allen Oil Co., Inc. v. C.I.R., 614 F.2d 336, 339 (2d Cir.1980) (a statute should be construed to give force and effect to each of its provisions rather than render some of them meaningless); see also United States v. Blasius, 397 F.2d 203 (2d Cir.1968), cert. dismissed, 393 U.S. 1008, 89 S.Ct. 615, 21 L.Ed.2d 557 (1969); United States v. Dinerstein, 362 F.2d 852 (2d Cir.1966). Accordingly, a violation of Sec. 380 can properly be grounded upon a violation of subsection (a)(1) alone, notwithstanding Intelicense's exhortations to the contrary.
 
 
 16
 When viewed against the factual landscape present in the instant case coupled with Congress's intent in enacting Sec. 380 and the plain statutory language of subsection (a)(1), we cannot imagine a more blatant violation of the Act. Indeed, it is uncontroverted that Intelicense made commercial use of the Olympic symbol to induce the sale of goods in the United States, without having secured the consent of the USOC.[4] This is all that subsection (a)(1) requires. See International Olympic Committee v. San Francisco Arts and Athletics, supra.
 
 
 17
 In an effort to circumvent the result clearly dictated by (a)(1), Intelicense contends that (a)(1) is not implicated in this action because the pictograms display the Olympic rings in conjunction with another design. But, this claim also is entirely without merit. There is absolutely nothing in the legislative history of Sec. 380, or elsewhere, to support the argument that the Olympic symbol loses its identity when combined with other elements. Moreover, such a strained reading of (a)(1) vitiates the very interests sought to be safeguarded by the enactment of Sec. 380. This statute does not merely prohibit marketing the Olympic symbol itself, but more significantly, it forbids any commercial use without the consent of the USOC. See United States Olympic Committee v. International Federation of Body Builders, supra.
 
 
 18
 In addition, Intelicense maintains that Sec. 380 incorporates not only the Trademark Act's remedial provisions, 15 U.S.C. Secs. 1116-1118, but also its standards for violation, 15 U.S.C. Sec. 1114(1)(a) (relief can be granted only where a trademark is used in a manner "likely to cause confusion, or to cause mistake, or to deceive"). Intelicense urges, absent an iota of support in the statute or case law, that we incorporate the more restrictive "likelihood of confusion" standard into the provisions of Sec. 380. The upshot of this claim would be to supplant the "use without the USOC's consent" standard expressly set forth in Sec. 380, and dramatically constrain the effective scope of the statute, as well as to frustrate the Act's unequivocal purpose. We are in agreement with the cogent analysis provided by one court, which stated that "Congress must have meant to place less of a burden on a plaintiff under a section 380 cause of action than that placed upon a plaintiff suing under the Trademark Act alone." International Olympic Committee v. San Francisco Arts and Athletics, supra, 219 U.S.P.Q. at 986.
 
 
 19
 Intelicense posits, moreover, that Sec. 380 is unconstitutional as applied to the facts of the instant action because it represents a taking of property. We find this argument to be equally unsupportable. The taking in question allegedly stems from the USOC's authority, derived from Sec. 380, to block Intelicense's agreement with the IOC, whereby the former was granted the exclusive worldwide rights to be the marketing agent for the Olympic pictograms. Intelicense cannot possibly demonstrate, however, that its property has been taken by the United States Government via the enactment of Sec. 380. Although the Amateur Sports Act was enacted in 1978, the agreements between Intelicense and the IOC were not entered into until October of 1979. Therefore, the enactment of Sec. 380 could not have deprived Intelicense of any property because it had no interest in the pictograms or the Olympic symbol at the time the Act became law.[5] Only the owner of an interest in property at the time of the alleged taking has standing to assert that a taking has occurred. See United States v. Dow, 357 U.S. 17, 78 S.Ct. 1039, 2 L.Ed.2d 1109 (1958); Lacey v. United States, 595 F.2d 614, 219 Ct.Cl. 551 (1979). Accordingly, only the IOC would have standing to raise a taking claim.
 
 
 20
 Perhaps cognizant of this legal principle, Intelicense alternatively posits that it has standing to assert a taking claim on behalf of the IOC, as its authorized agent. We find that such a claim is belied by the evidence adduced at trial. Indeed, in a letter from the IOC's director, Monique Berlioux, to Intelicense's director, Stanley Shefler, on October 13, 1980, the IOC explicitly accepted the authority vested in the USOC by Sec. 380 to control marketing of the Olympic symbol in the United States. And in a subsequent letter dated November 5, 1982, Berlioux advised Shefler that "any and all licensing activities should cease in the United States."[6]
 
 
 21
 Finally, the parties devote considerable attention to alternative sources of authority they believe bear prominently on the outcome of this action. At first blush, the question whether the 1978 or the 1983 version of the IOC Charter applies here might appear significant. The former version expressly disallows the commercial use of the Olympic emblem without the prior approval of the NOC in question, while the latter permits the commercial exploitation of the Olympic emblem, absent consent, so long as the NOC concerned is not seriously damaged. It is clear, however, that neither Charter governs this action because of the doctrine of preemption, under which a clear and unambiguous Congressional statutory command is controlling. See, e.g., Note, "A Framework for Preemption Analysis," 88 Yale L.J. 363, 364-65 (1978). The IOC Charter is not a treaty ratified in accordance with constitutional requirements. See art. II, Sec. 2, cl. 2.[7] It was not entered into by the head of state or by any other high United States official, nor was it ratified by two-thirds of the Senate. Moreover, the United States did not intend to be bound by the IOC Charter. See Restatement of Foreign Relations Law of the United States Sec. 115, comment f (1965). Indeed, at a 1981 diplomatic conference in Kenya, the United States cast the lone dissenting vote against a treaty that was to give the IOC worldwide control over the use of the Olympic symbol. The United States opposed the treaty precisely because it would contravene the thrust of Sec. 380. Accordingly, the United States' position on the licensing of the Olympic symbol is unequivocal and is encapsulated in Sec. 380, and, as such, cannot be overborne by the terms of either version of the IOC Charter.[8]
 
 
 22
 Congress expressly chose to safeguard the United States Olympic movement by enacting Sec. 380. We hold that Intelicense has violated both the letter and spirit of Sec. 380 by commercially marketing the pictograms in the United States without the consent of the USOC. Accordingly, we affirm the district court's permanent injunction.
 
 
 
 [1]
 The USOC filed suit against Intelicense and its licensees, Millsport, Inc. and Sport Graphics, Inc. in the United States District Court for the District of Columbia USOC v. Millsport, Inc. Permanent injunctions were entered against these two sublicensees under Sec. 380, and, consequently, they are no longer parties to the instant action. Sublicensee ISM, however, was added and remains a party to the suit
 In a separate action, ISM filed suit against the IOC and the USOC in the United States District Court for the District of Vermont, alleging interference with its contractual rights pursuant to its sublicensing agreement with Intelicense.
 On May 31, 1983, the United States District Court for the District of Columbia ordered the transfer of USOC v. Millsport, Inc. to the District of Vermont. USOC v. Millsport, Inc. was consolidated with ISM v. IOC & USOC on September 9, 1983, and by stipulation of the parties, IOC was dismissed from the case. On October 6, 1983, the USOC applied for a preliminary injunction. Pursuant to Fed.R.Civ.P. 65, the District Court ordered the consolidation of the trial on the merits and the hearing of the application for a preliminary injunction.
 
 
 [2]
 Also relevant to a complete understanding of this case are the 1978 and 1983 revisions to the IOC Charter. The 1978 version, cited with approval in the legislative history of the Amateur Sports Act, requires the prior consent of a particular territory's National Olympic Committee before the Olympic emblem can be marketed within the territory. According to the 1983 version, the "Olympic emblem may be exploited so long as the exploitation does not cause serious damage to the National Olympic Committee concerned."
 
 
 [3]
 Indeed, during the period of 1980-1982, the USOC received 45% of its income from its 44 corporate sponsors. Under the USOC's corporate sponsorship program, each participant is authorized to use the USA Olympic emblem which contains the Olympic rings in exchange for a minimum guaranteed monetary contribution to the USOC. As the trial court concluded, if the USOC could not grant excusive rights to market the Olympic symbol, the number of corporate participants would greatly be reduced and the USOC would find itself unable to raise the funds required for participation in the Olympic Movement
 
 
 [4]
 In fact, the USOC had explicitly informed Intelicense of its refusal to consent to such conduct
 
 
 [5]
 Nor is there any allegation that Intelicense possessed a property interest in contemplation of consummating its arrangement with the IOC, prior to the enactment of Sec. 380
 
 
 [6]
 Because this letter clearly expresses the IOC's position, we find it useful to set forth its contents
 "Dear Mr. Shefler:
 The purpose of this letter is once again to advise you that your company's authority to advertise, market and distribute the official IOC pictograms is only effective to the extent that you have obtained the consent of the respective National Olympic Committees in the countries in which items containing the exact reproduction of the approved IOC pictograms intend to be marketed. As you know, the USOC has advised us that it does not intend to consent to the marketing of any product bearing the IOC pictograms in the United States. In view of this position, you should be advised that any and all licensing activities should cease in the United States.
 Should you have any questions concerning the above, I would be happy to discuss them with you.
 Very truly yours,
 MONIQUE BERLIOUX
 Director"
 
 
 [7]
 If the IOC Charter were in fact a treaty, the Constitution states that treaties and acts of Congress are of equal force. See U.S. Const. art. VI, cl. 2; Reid v. Covert, 354 U.S. 1, 18, 77 S.Ct. 1222, 1231, 1 L.Ed.2d 1148 (1957)
 
 
 [8]
 At most, the 1978 version provides a gloss on Congress's intent in promulgating Sec. 380. This is substantiated by the reference to the 1978 Charter in the legislative history of Sec. 380, reflecting Congress's desire to achieve at least a modicum of consonance between the two provisions. See H.R.Rep. No. 95-1627, 95 Cong.2d Sess. (1978), U.S.Code Cong. & Admin.News 1978, p. 7478