**Thelma W. SPEIR et al.**

v.

**The UNITED STATES.**

**No. 728–71.**

United States Court of Claims.

Oct. 17, 1973.

David H. Fritts, Savannah, Ga., attorney of record for plaintiffs.

J. Hank Meshorer, Washington, D. C., with whom was Asst. Atty. Gen. Wallace H. Johnson, for defendant.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KUNZIG and BENNETT, Judges.

## OPINION

PER CURIAM:

This case comes before the court on plaintiffs' motion, filed July 19, 1973, requesting that the court adopt, as the basis for its judgment in this case, the recommended decision, filed April 24, 1973, by Senior Trial Judge Mastin G. White pursuant to Rule 134(h), defendant having filed no exceptions thereto and the time for so filing pursuant to the Rules of the court having expired. Upon consideration thereof, without oral argument, since the court agrees with the decision, as hereinafter set forth,* it hereby affirms and adopts the same as the basis for its judgment in this case. Therefore, it is concluded that plaintiffs are entitled to recover for the temporary taking of an avigation easement over their property during the period that began on October 18, 1967, and ended on March 22, 1972, and judgment is entered for plaintiffs to that effect with the amount of recovery to be determined in subsequent proceedings under Rule 131(c).

## OPINION OF TRIAL JUDGE

WHITE, Senior Trial Judge:

The plaintiffs are the owners of a 683-acre tract of land commonly known as the "Tipperary Tract," which is located in a sparsely settled portion of Chatham County, Georgia, approximately 16½ miles west of Savannah, Georgia. They sue in the present case because of the alleged taking by the defendant of a so-called avigation easement, or easement of flight, for military aircraft over their property.

It is my opinion that the plaintiffs are entitled to recover, but not the amount requested in the petition.

About one-half of the Tipperary Tract is cleared and, at all times material to this case, has been used by the plaintiffs for the growing of crops and the raising of beef cattle. The remainder of the tract is pine woodland, with the exception of approximately 70 acres in the eastern portion of the property, where there is a hardwood swamp adjacent to the Little Ogeechee River. The farming operations on the Tipperary Tract are performed by a farm hand, who is employed by, and receives wages from, the plaintiffs for this purpose. The farmer, together with other members of his family, lives in a small frame dwelling that is located near the center of the Tipperary Tract.

In addition to the farming operations previously mentioned, the Tipperary Tract has been used to some extent through the years for recreational purposes, particularly dove hunting and quail hunting.

Sometime prior to June 1967, and as a result of the intensification of the war in Vietnam, Hunter Army Airfield at

---

* Whereas the court adopts the trial judge's separate findings of fact which are set forth in his report filed April 24, 1973, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

Savannah, Georgia, was assigned the mission of training Army helicopter pilots. In order to augment this mission, the Army constructed at various locations in Chatham County, Georgia, staging fields where helicopter pilots involved in the training program could practice landings and takeoffs. One of these staging fields, commonly known as "Cu Chi," was located approximately 1,490 feet southeast of the Tipperary Tract.

Upon the completion of Cu Chi in the fall of 1967, the field consisted of six paved parallel runways, running in a northwesterly-southeasterly direction. In addition, a metal building on a concrete slab, a brick building, and an air-traffic control tower 25 feet tall were constructed at Cu Chi. The buildings were used for the storage of equipment, while the tower contained a console and radio equipment for communicating with airborne pilots. The buildings at Cu Chi were heated, but no running water was available. The field was furnished with an outdoor latrine.

Army helicopter flights began at Cu Chi on October 18, 1967. On the first day, there were approximately 60 to 70 flights by helicopters over the Tipperary Tract. Thereafter, the helicopter flight training at Cu Chi continued until March 22, 1972, on the basis of 6 days per week, with the daily flight program beginning around 7 a. m. and continuing until the late afternoon or into the evening (e. g., until 8 p. m. or 9 p. m.). The number of helicopter flights over the Tipperary Tract gradually increased until 1969, when such flights averaged 11,533 per month. The number of helicopter flights over the Tipperary Tract gradually decreased after 1969, but even in 1972, up until March 22, such flights totaled 9,434.

When flying over the Tipperary Tract before landing at, or after taking off from, Cu Chi, helicopters flew at an altitude that varied between a minimum of about 250 feet above the surface (over the portions of the Tipperary Tract near Cu Chi) and a maximum of about 700 feet above the surface (over portions of the Tipperary Tract distant from Cu Chi). Helicopters were generally at a height of less than 500 feet above the surface when they flew over the farmhouse on the Tipperary Tract.

■ There is a public right of freedom of transit in the airspace over privately owned land beginning at the 500-foot level above the surface of the ground in uncongested areas, and the public has the right to travel in this airspace with the same freedom as it has to travel on the public highways or on navigable waters. Aaron v. United States, 311 F.2d 798, 801, 160 Ct.Cl. 295, 300 (1963); Town and Country Motor Hotel, Inc. v. United States, 180 Ct.Cl. 563, 570–571 (1967). On the other hand, numerous court decisions have held that where flights by Government-owned aircraft over privately owned land at altitudes of less than 500 feet from the surface of the ground have been of such frequency and have created such conditions as to constitute a direct, immediate, and substantial interference with the use and enjoyment of the property, there has been a taking by the Government of an avigation easement, or easement of flight, in the airspace over the property, and this taking is compensable under the Fifth Amendment to the Constitution (e. g., United States v. Causby, 328 U.S. 256, 266, 66 S.Ct. 1062, 90 L. Ed. 1206 (1946); Mid-States Fats and Oils Corp. v. United States, 159 Ct.Cl. 301, 309 (1962); A. J. Hodges Industries, Inc. v. United States, 355 F.2d 592, 594, 174 Ct.Cl. 259, 262 (1966)).

■ As previously indicated in this opinion, Government-owned helicopters flew above the Tipperary Tract with great frequency during the period from October 18, 1967, to March 22, 1972, and apparently each of these flights was at an altitude of about 250 feet above the surface of the ground as the helicopter passed over the portion of the Tipperary Tract near Cu Chi, immediately before landing at or taking off from Cu Chi. Although these helicopter flights at low

altitudes were wrongful invasions into the airspace as to which the plaintiffs had a legally protected property interest, such flights did not amount to a taking of an avigation easement unless they interfered substantially with the use and enjoyment of the property. Adaman Mutual Water Co. v. United States, 181 F.Supp. 658, 659, 143 Ct.Cl. 921, 923 (1958).

There is no evidence in the record indicating that flights by helicopters over the Tipperary Tract during the period October 1967–March 1972 interfered with the crops, the cattle, or the timber on the Tipperary Tract. On the other hand, the evidence shows that helicopter flights at altitudes of less than 500 feet over the farmhouse on the Tipperary Tract interfered with television reception there, causing the TV picture to "jump" and drowning out the sound from the TV set; that a telephone conversation at the farmhouse was impossible when a helicopter was flying overhead at an altitude of less than 500 feet; that a conversation face-to-face anywhere on the Tipperary Tract was impossible when a helicopter was flying overhead at a height of less than 500 feet; that the noise from helicopters flying overhead caused doves to leave the Tipperary Tract, and thus ruined the dove hunting on the tract; and that the noise from helicopters flying overhead also seriously interfered with the quail hunting on the Tipperary Tract. The noise from helicopters flying over the Tipperary Tract at low altitudes was variously described as "bad," "rather piercing," "weird," "annoying," "most definitely bothersome," "very irritable [irritating]," and "unbearable."

▇ The facts summarized in the preceding paragraph of this opinion warrant the conclusion, and it is found, that flights by Government-owned helicopters over the Tipperary Tract at low altitudes interfered substantially with the use and enjoyment of the property, and, therefore, that the defendant took an avigation easement, or easement of flight, for flights by Government-owned

helicopters through the airspace over this property at altitudes of 250 feet and higher above the surface of the ground. The avigation easement began in the airspace at the lowest elevation regularly and frequently affected by the intrusions of the Government-owned helicopters; and the easement pertained to the airspace over the entire tract of land. A. J. Hodges Industries, Inc. v. United States, *supra*, 355 F.2d at 596–597, 174 Ct.Cl. at 266.

▇ The taking occurred on October 18, 1967, when the defendant began to fly its helicopters regularly and frequently through the airspace at low altitudes above the Tipperary Tract, with the intent to continue to fly the helicopters over the property at will. Highland Park, Inc. v. United States, 161 F.Supp. 597, 600, 142 Ct.Cl. 269, 273 (1958).

However, it appears that the defendant, at the time when its helicopters began to fly regularly and frequently through the airspace above the Tipperary Tract at low altitudes, did not intend to utilize the airspace for such flights on a permanent basis. The establishment of Cu Chi was an outgrowth of the intensification of the war in Vietnam, and the evidence indicates that it was the defendant's intention to utilize Cu Chi only so long as there was a heavy demand for Army helicopter pilots in Vietnam. As this country's participation in the Vietnam war wound down, the need for Cu Chi ended, and that field was closed on March 22, 1972. The runways were painted with X's, indicating that the field was closed; the gate to the field was locked; the console and radios were removed from the tower; the contract providing for electrical power to the field was cancelled; and all persons who had previously provided support for the operations at Cu Chi— such as crash rescue, air traffic control, and fuel—were notified that they were no longer needed at Cu Chi. Since March 22, 1972, the training arm of Hunter Army Airfield has not had any need for or interest in Cu Chi; and the Army does not have any plan to reacti-

vate Cu Chi. In fact, Hunter Army Airfield is in jeopardy of being closed.

■■ The Government's intention—at the time when it first caused its helicopters to fly over the Tipperary Tract at low altitudes—with respect to the permanent or temporary use of such airspace is an important factor in determining whether the avigation easement was a permanent one or a temporary one. Aaron v. United States, *supra,* 311 F.2d at 802, 160 Ct.Cl. at 312. Since Cu Chi, from its inception, was a temporary facility and was to be used only for a temporary period (although the length of that period was unknown at the beginning), it is concluded that the avigation easement taken by the defendant in the airspace over the Tipperary Tract was a temporary one and terminated on March 22, 1972.

■ Under the Fifth Amendment to the Constitution, the plaintiffs are entitled to "just compensation" for the property interest that was taken by the defendant for the period from October 18, 1967, to March 22, 1972. Just compensation is the value of the interest taken; and the term "value" is ordinarily used in the sense of "market value" or "fair market value," *i. e.,* "market value fairly determined." United States v. Miller, 317 U.S. 369, 374, 63 S.Ct. 276, 87 L.Ed. 336 (1943); General Motors Corp. v. United States, 323 U.S. 373, 379, 65 S.Ct. 357, 89 L.Ed. 311 (1945).

■ Compensation for the taking of an easement of flight is to be determined as of the time and place of the taking. Mid-States Fats and Oils Corp. v. United States, *supra,* 159 Ct.Cl. at 309. Unfortunately, the evidence in the present record does not permit a determination to be made concerning the value of the avigation easement that was taken temporarily by the defendant in the airspace above the Tipperary Tract on October 18, 1967. The plaintiffs' theory of the case was that the defendant took a permanent avigation easement in the airspace over their property, and that this forever deprived them of

any opportunity to develop the Tipperary Tract for residential use. In this connection, the evidence shows that, as of October 1967, it was the intention of the plaintiffs to develop the Tipperary Tract for residential use by subdividing it into small farm tracts whenever conditions might seem to be right for such development.

However, the conditions were not right in October 1967 for the residential development of the Tipperary Tract. As of October 1967, the general area surrounding the Tipperary Tract was very sparsely populated, and it was the slowest-growing part of Chatham County. The Tipperary Tract itself was relatively inaccessible, as it could be reached only by way of a couple of unpaved dirt roads, which were so narrow that it was difficult for two automobiles to pass each other on either of these roads. Because of the dirt surface, the two roads were virtually unusable in wet weather. There was no public water system or sewer system in the area, and none was planned for the area. Consequently, the conclusion seems inescapable that the highest and best use of the Tipperary Tract as of October 1967 was for agricultural purposes, and not for residential development by being divided into small farm tracts.

Furthermore, as indicated in an earlier portion of this opinion, the Government's action in temporarily taking an avigation easement in the airspace above the Tipperary Tract did not permanently deprive (and it probably did not even delay) the plaintiffs in carrying out their plan of ultimately developing the Tipperary Tract for residential use whenever conditions might seem to be right for such development. The defendant's avigation easement terminated on March 22, 1972, and since that date the defendant has not had any right to operate its aircraft in the airspace above the Tipperary Tract at low altitudes. Consequently, that particular factor will not hamper the plaintiffs in the development of the Tipperary Tract for resi-

dential use whenever they decide that such development is expedient.

█ As the plaintiffs' evidence in the present record on the subject of damages is not helpful in determining the value of the property interest which the defendant actually took, it will be necessary for the issue of damages to be determined in subsequent proceedings under Rule 131(c), unless the parties are able to reach an agreement on that point.