**John B. LACEY and Sue C. Lacey**

v.

**The UNITED STATES.**

**No. 20–76.**

United States Court of Claims.

March 21, 1979.

Terence S. Weakly, San Antonio, Tex., attorney of record, for plaintiffs.

Ronald G. Gluck, Washington, D. C., with whom was Asst. Atty. Gen., James W. Moorman, Washington, D. C., for defendant.

Before FRIEDMAN, Chief Judge, and DAVIS and SMITH, Judges.

## OPINION

PER CURIAM:

This case comes before the court on defendant's motion, filed January 25, 1979, requesting that the court adopt, as the basis for its judgment in this case, the recommended decision of Senior Trial Judge Mastin G. White, filed December 19, 1978, pursuant to Rule 134(h), since neither party has filed a notice of intention to except thereto and the time for so filing pursuant to the Rules of the court has expired. Upon consideration thereof, without oral argument, since the court agrees with the trial judge's recommended decision, as hereinafter set forth *, it hereby grants defendant's motion and affirms and adopts the decision as the basis of its judgment in this case. It is, therefore, concluded as a matter of law that plaintiffs are not entitled to recover and the petition is dismissed.

## OPINION OF TRIAL JUDGE

WHITE, Senior Trial Judge: The plaintiffs, who are husband and wife, sue in the present case because of the alleged taking by the defendant of a so-called avigation easement, or easement of flight, in the airspace above a 638.82-acre parcel of land situated in an uncongested rural area of Jim Wells County, Texas. It is agricultural land, and has been used principally for the grazing of cattle. (For the sake of convenience, this parcel of land will usually be referred to hereafter in the opinion as "the ranch.")

■ The avigation easement concept was formulated by the Supreme Court in the landmark case of the *United States v. Causby*, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946). In that case, the Court was called upon to weigh the conflicting interests (1) of the Government (and, by implication, of others) in connection with the need to use the air for the passage of aircraft, and (2) of the owners of subjacent lands in connection with the need for reasonable tranquility in the airspace overhead so that they may use and enjoy their property. On the one hand, the Court, speaking generally, referred (at 261, 66 S.Ct. 1062) to the air as a public highway and (at 266, 66 S.Ct. 1062) to the airspace overhead as being part of the public domain. On the other hand, the Court said (at 264–65, 66 S.Ct. 1062) that a landowner must have exclusive control of the immediate reaches of the enveloping atmosphere if he is to have full enjoyment of his land and, accordingly, that a landowner is protected against intrusions in the airspace so immediate and direct as to subtract from the owner's full enjoyment of the property and to limit his exploitation of it. The *Causby* case established the rule that flights by Government-owned aircraft over private land are a "taking" under the Fifth Amendment of an easement in the overhead airspace if such flights are so low and so frequent as to be a direct and immediate interference with the use and enjoyment of the land.

The rule mentioned in the preceding paragraph has been applied by this court in numerous cases (*e. g., Davis v. United States*, 295 F.2d 931, 932, 155 Ct.Cl. 418, 420

---

* Although the court adopted the trial judge's separate findings of fact, which are set forth in his opinion, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

(1961); *A. J. Hodges Industries, Inc. v. United States,* 355 F.2d 592, 594, 174 Ct.Cl. 259, 262 (1966); *Speir v. United States,* 485 F.2d 643, 646, 202 Ct.Cl. 1020, 1024 (1973)).

The Court indicated in the *Causby* case (328 U.S. at 263, 66 S.Ct. 1062) that the dividing line between the portion of the airspace in the public domain and the portion protected as an incident of land ownership against invasions by aircraft was the line delineated by the Civil Aeronautics Authority (now the Federal Aviation Administration) as the minimum safe altitude of flight. At all times relevant to this case, the minimum safe altitude of flight, as prescribed by administrative regulation, has been 500 feet above the ground level in uncongested areas (14 C.F.R. 60.17(c) (1956), recodified as 14 C.F.R. 91.79 (1976)). The validity of the 500-foot line of demarcation has been recognized in judicial decisions. *Matson v. United States,* 171 F.Supp. 283, 286, 145 Ct.Cl. 225, 229 (1959); *Aaron v. United States,* 311 F.2d 798, 801, 160 Ct.Cl. 295, 300 (1963); *A. J. Hodges Industries, Inc. v. United States, supra,* 355 F.2d at 594, 174 Ct.Cl. at 262; *cf. Jensen v. United States,* 305 F.2d 444, 449, 158 Ct.Cl. 333, 341–42 (1962).

Therefore, the first question to be decided in the present case is whether invasions by Government-owned aircraft in the airspace above the ranch at altitudes of less than 500 feet above the ground level were so frequent as to be a direct and immediate interference with the use and enjoyment of the land.

The ranch is located east of—and, at the nearest point, less than a mile from—the Naval Auxiliary Landing Field operated by the Navy Department at Orange Grove, Texas ("the NALF–Orange Grove"). There is a house on the ranch, and it is located approximately 6,700 feet east of the center line of runway 13 at the NALF–Orange Grove, this being the busiest of the runways at the landing field.

The NALF–Orange Grove became operational on November 1, 1956, as a permanent naval facility. It has been utilized by the Navy continuously since its opening, with the exception of the period from August 1975 through May 1976, when the runways were being repaired and the facility was closed.

The most important factor in the design of the runways at the NALF–Orange Grove was the historical pattern of the prevailing wind direction in the Gulf Coast region of Texas where the facility is located. The prevailing wind in this region is from the southeast; and this necessitated a northwest-southeast runway, which is designated as runway 13/31. The secondary winds, or cross-winds, are mostly from the south; and, consequently, a second runway, designated as runway 19/01, was built in a north-south direction.

The runways present four alternatives for a takeoff from, or a landing at, the NALF–Orange Grove: *i. e.,* toward the southeast on runway 13; toward the northwest on runway 31; toward the south on runway 19; or toward the north on runway 01. The primary consideration in choosing a runway for either a takeoff or a landing is the direction of the wind at the time of the maneuver, as an aircraft takes off or lands into the wind under ordinary operating conditions.

The NALF–Orange Grove was designed for the training of pilots for fleet carrier jet aircraft; and throughout the existence of the facility, since it became operational on November 1, 1956, it has been used for this purpose, and for this purpose only (with the exception of the August 1975—May 1976 period, when the runways were being repaired).

Pilots and aircraft have not been assigned to the NALF–Orange Grove at any time for regular training operations. Rather, pilots and jet aircraft assigned to the Naval Air Station at Kingsville, Texas, have regularly utilized the NALF–Orange Grove from 1956 until the present time for training operations. In addition, pilots and jet aircraft assigned to the Naval Air Station at Beeville, Texas, regularly used the NALF–Orange Grove from 1956 until 1969 for training operations. In 1969, the Naval Auxiliary Landing Field at Goliad, Texas,

became operational; and since that time the pilots and aircraft assigned to the Naval Air Station at Beeville have utilized the Goliad facility instead of the Orange Grove facility for training purposes.

Throughout the existence of the NALF–Orange Grove, the training operations conducted there have involved flight patterns known as "touch and go" and "field carrier landing practice."

On a "touch and go" pattern at the NALF–Orange Grove, an aircraft, observing a prescribed minimum altitude, flies a downwind leg to the right of, and parallel to, the runway that is to be used; then, at an appropriate point beyond the end of the runway, makes a 180-degree turn to the left in order to line up with the runway; then, flying into the wind, makes a touchdown on the runway at a point reasonably near the closest end and immediately takes off again without stopping; then, upon reaching a prescribed minimum altitude, makes a 180-degree turn to the left; and then repeats the maneuver, flying a downwind leg, etc.

A "field carrier landing practice" pattern at the NALF–Orange Grove is similar to a "touch and go" pattern, except that the aircraft, after the touchdown on the selected runway, is brought to a halt within a prescribed maximum distance. A repetition of the "field carrier landing practice" involves a takeoff from the runway; then, after reaching a prescribed minimum altitude, the making of a 180-degree turn to the left; then the flying of a downwind leg, etc.

An aircraft using runway 13 or runway 19 at the NALF–Orange Grove for a "touch and go" pattern or a "field carrier landing practice" pattern customarily flies through the airspace above the ranch during the downwind leg of the pattern. As approximately 60 percent of the "touch and go" flights and "field carrier landing practice" flights at the facility have involved the utilization of runway 13, and approximately 11 percent of such flights have involved the utilization of runway 19, this means that aircraft have flown through the airspace above the ranch in connection with approxi-

mately 71 percent of the flights at the NALF–Orange Grove since the facility became operational on November 1, 1956.

There is a scarcity of information in the record concerning the types of aircraft that were used in the training operations at the NALF–Orange Grove during 1956 and 1957, the altitudes at which they flew when passing through the airspace above the ranch during the downwind leg of the training flights, and the noise that they made. There is information as to these matters, however, for 1958 and thereafter.

During the period beginning in 1958 and extending through 1969, the air squadrons from the Naval Air Stations at Kingsville and Beeville that used the NALF–Orange Grove for training operations were equipped with the F9, a single-engine jet aircraft. The engine in this plane had a maximum thrust (*i. e.,* when using constant military power) of 7,250 lbs., and the noise which it generated when passing overhead range from 131 decibels at an altitude of 50 feet above the ground level to 108 decibels at an altitude of 1,000 feet. Although data concerning the number of flights made by F9 aircraft through the airspace above the ranch are not available for the years 1958 and 1959, the data for subsequent years show that the number of such flights range from a low of approximately 19,429 in 1960 to a high of approximately 70,780 in 1968.

The air squadrons utilizing the NALF–Orange Grove began to use a new type of aircraft, the A4J, regularly in 1969. The F9 was still being used also in 1969, but its use was discontinued after 1969. The use of the A4J for training operations at the facility has continued from 1969 until the present time. The A4J is equipped with a single jet engine, which has a maximum thrust of 8,500 lbs. When this aircraft is passing overhead, the noise which it generates ranges from 133 decibels at an altitude of 50 feet above the ground level to 110 decibels at 1,000 feet. The A4J aircraft and the F9 aircraft made a total of approximately 49,079 flights through the airspace above the ranch in 1969. The A4J was the only aircraft used for training operations at

the NALF–Orange Grove in 1970 and 1971, and the overflights above the ranch during those years totaled about 35,134 in 1970 and about 33,678 in 1971.

The air squadrons utilizing the NALF–Orange Grove for training operations began to use another type of aircraft, the T2C, in 1972, along with the A4J; and the use of these two types of aircraft has continued until the present time. The T2C is a twin-engine jet aircraft; each engine has a maximum thrust of 2,950 lbs.; and this aircraft, when passing overhead, generates a noise in decibels that ranges from 127 at an altitude of 50 feet above the ground level to 104 at an altitude of 1,000 feet. The overflights by the T2C and the A4J above the ranch during the course of training operations numbered approximately 35,207 in 1972, 34,-612 in 1973, 33,032 in 1974, 15,773 in 1975 (the runways at the NALF–Orange Grove were being repaired during the latter part of 1975), 42,075 in 1976 (the runways were still being repaired during the early part of 1976), and 56,444 in 1977.

The overflights above the ranch mentioned in previous paragraphs included both "touch and go" patterns and "field carrier landing practice" patterns. We do not have a breakdown of the statistics, however, based on the type of flight.

The evidence in the record shows that, at the times relevant to this case, the prescribed minimum altitude for the various types of aircraft on the downwind leg of a "touch and go" pattern at the NALF–Orange Grove was 1,000 feet above ground level, and that the aircraft, while performing the downwind leg of "touch and go" flights, did not regularly or frequently fly at an altitude lower than 500 feet above the ground level while passing through the airspace above the ranch.

On the other hand, the evidence in the record shows that the prescribed minimum altitude on the downwind leg of a "field carrier landing practice" pattern at the NALF–Orange Grove by the F9 aircraft during the 1958–69 period, by the A4J aircraft during the 1969–73 period, and by the T2C aircraft during the 1972–75 period, was 450 feet above the ground level. The evidence also shows that, during the periods just mentioned, the various types of aircraft customarily flew at an altitude of 450 feet above ground level—but not frequently or regularly at a lower altitude—while passing through the airspace above the ranch during the downwind leg of "field carrier landing practice" flights.

■ The regular and frequent flights by naval jet aircraft through the airspace above the ranch at an altitude of 450 feet above the ground level interfered unreasonably with the use and enjoyment of the property. The noise from such aircraft made it impossible or difficult to use the telephone in the residence, made conversation on the property impossible or difficult, greatly interfered with television reception in the residence, and interfered substantially with ranch operations (the noise from the aircraft drowned out attempts by the ranch operator to call cattle for feeding operations). Accordingly, under the test prescribed by the Supreme Court in the *Causby* case and mentioned earlier in this opinion, the defendant has taken an avigation easement in the airspace above the ranch for flights by Government-owned jet-powered aircraft at an altitude of 450 feet above the ground level, and higher.

■ The taking of an avigation easement by the Government occurs when the Government begins to operate aircraft regularly and frequently over a parcel of land at low altitudes, with the intention of continuing such flights indefinitely. *Adaman Mutual Water Co. v. United States*, 181 F.Supp. 658, 660, 143 Ct.Cl. 921, 924 (1958); *A. J. Hodges Industries, Inc. v. United States, supra*, 355 F.2d at 596, 174 Ct.Cl. at 265–66. In the present case, the facts previously outlined show that, at least by 1960, naval jet aircraft were flying thousands of times per year through the airspace above the ranch at an altitude of 450 feet above the ground level, and the noise from such low-altitude flights was interfering unreasonably with the use and enjoyment of the property. Accordingly, it must necessarily be concluded that the Government, not la-

ter than 1960, took an avigation easement in the airspace above the ranch for flights by Government-owned jet-powered aircraft at an altitude of 450 feet above the surface of the ground, and higher. As this court operates under a 6-year statute of limitations (28 U.S.C. § 2501) for the filing of petitions on claims against the United States, the obvious reaction to the petition filed by the plaintiffs on January 26, 1976, is that it was filed much too late.

The preponderance of the evidence shows that the defendant did not, at any time after 1960, begin regular and frequent overflights above the ranch at an altitude lower than 450 feet above the ground level (*cf. A. J. Hodges Industries, Inc. v. United States, supra,* 355 F.2d at 597, 174 Ct.Cl. at 267), or introduce an appreciably noisier aircraft into the operations at the NALF–Orange Grove[1] (*cf. Avery v. United States,* 330 F.2d 640, 643, 165 Ct.Cl. 357, 362 (1964)). Consequently, we do not have the problem of a second taking in this case.

■ The plaintiffs seek comfort from a line of decisions holding that a landowner's cause of action for the taking of an avigation easement will not be considered to have accrued until the permanence and degree of the impairment of the landowner's rights are ascertainable. *Klein v. United States,* 152 Ct.Cl. 221, 224 (1961), *cert. denied,* 366 U.S. 936, 81 S.Ct. 1661, 6 L.Ed.2d 847 (1961); *Aaron v. United States, supra,* 311 F.2d at 800–01, 160 Ct.Cl. at 299–300 (1963). In the present case, however, the NALF–Orange Grove was constructed as a permanent naval facility; the use of the facility had reached the point by 1960 that there were approximately 19,429 flights through the airspace above the ranch by aircraft operating at the landing field; although the number of overflights above the ranch was greater than 19,429 every year after 1960 (except 1975, when the NALF–Orange Grove was closed for some months while the runways were being repaired), the

greatest number of overflights occurred in 1968, some 8 years before the petition was filed by the plaintiffs; and the aircraft flying in the 1960–68 period were just as noisy[2] and were flying just as low as the aircraft operating in the 6-year period immediately preceding the filing of the petition. Therefore, the permanence and the decree of the impairment of the landowner's rights by overflights above the ranch were readily ascertainable long before the beginning of the 6-year period that immediately preceded the filing of the petition.

The conclusion is unavoidable that this action is barred by the 6-year statute of limitations.

■■ There is also another ground that requires the rejection of the claim asserted by the plaintiffs. The person entitled to compensation for a taking of property by the Government is the owner of the property at the time of the taking. *Dow v. United States,* 357 U.S. 17, 20, 78 S.Ct. 1039, 2 L.Ed.2d 1109 (1958); *Vroman v. United States,* 177 F.Supp. 257, 258, 147 Ct.Cl. 285, 287–88 (1959). The plaintiffs did not, either individually or jointly, have any proprietary interest in the ranch at the time when the Government took an avigation easement in the airspace above the ranch.

The ranch was owned by Jim Adams, the maternal grandfather of the plaintiff John B. Lacey, from 1944 until the time of his death in 1962; and upon the death of Jim Adams, his widow, Edith Adams, the maternal grandmother of the plaintiff John B. Lacey, became the sole owner of the ranch. John B. Lacey acquired an interest of some sort in the ranch (the nature of such interest is not disclosed by the evidence in the record) under a deed from Edith Adams dated February 15, 1971; and he acquired the full ownership of the ranch under a correction warranty deed from Edith Adams dated July 2, 1972. As indicated earlier in this opinion, the avigation easement that is involved in the present case was

---

**1.** The 2-decibel difference between the noise of the F9 (during the 1958–69 period) and the noise of the A4J (from 1969 to the present time) cannot be detected by the human ear.

**2.** See fn. 1.

taken by the Government long before February 15, 1971, or July 2, 1972.

█ The plaintiffs' brief refers to the Government's involvement "in an air-intensive, undeclared war in Viet Nam" from 1962 through January 27, 1973; calls attention to the fact that flight operations at the NALF–Orange Grove greatly increased in number during such period, in comparison with the 1960 and 1961 operations; and says that the plaintiffs "were not obligated to bring suit for a taking of their property until after the situation had normalized and the OGNLF training operations were being conducted under peacetime conditions and they could project the foreseeable, permanent extent of Defendant's training activities."

The plaintiffs do not cite any judicial authority for the proposition that—and do not suggest any logical reason why—the existence of the Vietnam conflict, and the resulting increase in the number of training operations at the NALF–Orange Grove,

somehow relieved the landowner of the statutory obligation to file suit within 6 years for the taking of an avigation easement in the airspace above the ranch at a time prior to the beginning of the Vietnam conflict.

For the reasons previously stated in this opinion, the plaintiffs are not entitled to recover, and the petition should be dismissed.

## CONCLUSION OF LAW

Upon the findings of fact and the foregoing opinion, which are adopted by the court, the court concludes as a matter of law that the plaintiffs are not entitled to recover, and the petition is therefore dismissed.