Dennis ARGENT and Mary Argent; Elden M. Elliot; Kirk Francis; Roscoe B. Hatch and Bernice V. Hatch; Charles W. Olsen and Cheryl I. Olsen; Michael Siemion; Richard Turley and Vicki Long Turley, Plaintiffs–Appellants,

v.

THE UNITED STATES, Defendant–Appellee.

No. 96–5053.

United States Court of Appeals, Federal Circuit.

Sept. 2, 1997.

Rehearing Denied Nov. 18, 1997.

John G. Layman, Layman & Layman, of Spokane, WA, argued for plaintiffs-appellants. With him on brief was David A. Barbe. Of counsel was George M. Ahrend.

Robert H. Oakley, Attorney, Appellate Section, Environment and Natural Resources Division, Department of Justice, of Washington, DC, argued for defendant-appellee. With him on brief was Lois J. Schiffer, Assistant Attorney General.

Before MAYER, PLAGER, and RADER, Circuit Judges.

RADER, Circuit Judge.

The owners of forty-six parcels of land surrounding the Naval Air Station at Whidbey Island, Washington, filed this inverse condemnation action against the United States. The owners alleged that the United States, by its frequent and noisy aircraft operations, took avigation easements over their property and otherwise diminished their use and enjoyment of their property without paying just compensation. On the Government's motion, the United States Court of Federal Claims granted summary judgment against three groups of plaintiffs on various grounds. Because factual disputes preclude the entry of summary judgment, this court vacates and remands for further proceedings.

## I.

This dispute concerns an aircraft landing strip known as the Outlying Field, Coupeville (OLF Coupeville), which the Navy uses for practice landings. The Navy built the landing strip in 1943 and used it for emergency and practice landings until 1946. The Navy continued to use the landing strip through 1963 when the Navy declared the facility excess and made plans to sell it. In 1967, however, the Navy reactivated the facility to accommodate the increased training and operational demands of the Vietnam War.

Beginning at that time, the Navy used the landing strip for "field carrier landing practice," a training exercise designed to simulate landing on an aircraft carrier at sea. *See generally Branning v. United States*, 228 Ct.Cl. 240, 654 F.2d 88, 91 n. 3 (1981) (describing similar aircraft landing exercises). The exercise involves groups of up to five aircraft flying in patterns to practice touch-and-go landings. Each aircraft in turn approaches the runway and touches down, but then takes off again without coming to a stop. The aircraft then loops around and prepares for another landing. Each aircraft makes multiple touch-and-go landings before stopping to refuel. Aircraft in these exercises at OLF Coupeville fly at low altitudes over the private property surrounding the landing strip.

Since 1967, the Navy has continuously used OLF Coupeville for field carrier landing practice, but the amount of that use has varied. From 1967 through 1971, the Navy used the landing strip extensively, conducting as many as 39,246 operations in a single

year. After the Vietnam War ended, the Navy's use of OLF Coupeville declined, but did not cease. The following undisputed tabulation summarizes the Navy's annual use of OLF Coupeville, with each touch-and-go landing counted as two operations:

| Year | Ops | Year | Ops | Year | Ops | Year | Ops |
|------|------|------|------|------|------|------|------|
| 1967 | 1,236 | 1974 | 21,180 | 1981 | 16,848 | 1988 | 30,442 |
| 1968 | 27,130 | 1975 | 24,844 | 1982 | 14,472 | 1989 | 22,596 |
| 1969 | 39,246 | 1976 | 17,810 | 1983 | 11,782 | 1990 | 32,080 |
| 1970 | 37,218 | 1977 | 17,748 | 1984 | 12,726 | 1991 | 27,088 |
| 1971 | 18,392 | 1978 | 24,378 | 1985 | 13,924 | | |
| 1972 | 13,572 | 1979 | 20,282 | 1986 | 22,232 | | |
| 1973 | 16,764 | 1980 | 12,190 | 1987 | 30,350 | | |

The plaintiffs in this takings case own real property surrounding OLF Coupeville. They filed this action against the United States on April 29, 1992, alleging that the Government took their private property for public use without paying just compensation in violation of the Fifth Amendment. In general, the plaintiffs contend that the noise from aircraft flying over and around their property permanently and substantially interferes with their use and enjoyment of their property.

## II.

Before the Court of Federal Claims, the Government sought summary judgment against all plaintiffs on various grounds. After consideration, the trial court granted the Government's motion with respect to three distinct groups of plaintiffs. In reviewing the trial court's judgment, this court also treats each group separately.

## A.

With respect to the first group of plaintiffs, comprising six claimants, the Court of Federal Claims found the plaintiffs' proffered evidence legally insufficient to support a taking action. According to the court, "[t]he six plaintiffs . . . essentially concede in their affidavits that one or more of the necessary elements constituting the taking of an avigation easement have not been satisfied." Order of Court of Federal Claims (July 20, 1995), p. 4. The trial court formulated those "necessary elements" as follows:

When Government aircraft make regular and frequent flights directly over private

land at altitudes of less than 500 feet,[2] and this constitutes a direct, immediate, and substantial interference with the use and enjoyment of the property, the Government takes an avigation easement in the airspace over the property. *A.J. Hodges Industries, Inc. v. United States*, 174 Ct. Cl. 259, 262, 355 F.2d 592, 594 (1966). . . .

[2]. In *United States v. Causby*, the [Supreme] Court determined that the airspace, apart from the immediate reaches above the land, is part of the public domain. 328 U.S. 256, 266, 66 S.Ct. 1062, 1068, 90 L.Ed. 1206 (1946). Cases following *Causby* have concluded that flights above 500 feet in non-congested areas are in the public domain, *i.e.*, in navigable airspace. *Stephens v. United States*, 11 Cl.Ct. 352, 358–59 (1986) (citations omitted). In congested areas, the navigable airspace begins at 1,000 feet. *Id.; see also* 14 C.F.R. § 91.119 (1994).

Order of Court of Federal Claims (July 20, 1995), p. 3. Thus, the Court of Federal Claims applied a rule that takings require a substantial number of direct overflights at an altitude of less than 500 feet.

With respect to the evidence offered by Dennis and Mary Argent, the only members of the trial court's first group who appeal, the trial court concluded:

Dennis Argent (16) says nothing about the height of the flights and acknowledges that they occur sporadically:[8]

In 1981 the flights were an annoyance but tolerable. Since 1986 the flight numbers and annoyance have dramatically increased. When the jets are engaged in [field carrier landing practice] and using runway 14, they do fly over our house on occasion. However, the overflights are not as significant as the

noise caused by the cornering of the jets in their pattern. Pltfs' Ex. 5 (D. Argent Affidavit) at ¶ 3.

8. The Government attests that since October 1967 its aircraft seldom, if ever, fly over the property below 500 feet. Dfd's Ex. 11 (Melaas Affidavit) at ¶ 13; Dfd's Ex. C (Summary Matrices for Dfd's Exs. A and B).

Order of Court of Federal Claims (July 20, 1995), p. 6. Because the trial court deemed the Argents' factual allegations inadequate to satisfy the rule for avigational takings, the court granted summary judgment against them.

### B.

With respect to the second group—eleven property owners in an area known as Admiral's Cove—the Court of Federal Claims found these plaintiffs' claims barred by the six-year statute of limitations. The trial court found that the takings claims for these plaintiffs matured in the 1967–1968 timeframe, when the Navy began frequent and low flights over their properties. The plaintiffs argued that the 1967 easement was a temporary easement for the United States' war in Vietnam. However, the trial court concluded that the plaintiffs' argument ignored twenty years of intervening history during which the Admiral's Cove area lay beneath the final approach or initial takeoff path for all landing exercises at OLF Coupeville. On this basis, the trial court concluded that the 1967–1968 operations created a permanent easement more than six years before the plaintiffs' filing.

The trial court also considered, but rejected, the plaintiffs' claim that the United States took additional easements over their properties in 1986 and later years by increasing the number and type of flights flown over their property. Acknowledging that "a second (or new) taking may occur even though the Government has already acquired an easement above a tract of land," the trial court nonetheless rejected the plaintiffs' argument. According to the trial court, the undisputed evidence demonstrated that the increase in operations in 1986 was not a unique event in the twenty-year history of OLF Coupeville up to that time. Rather, the

numbers fluctuated over time. The trial court noted that in the years between 1967 and 1985, five years saw flight numbers greater than 1986, the year of the alleged second taking. Further, the trial court rejected the plaintiffs' evidence that the Navy began flying noisier aircraft after 1986.

On these grounds, the trial court found that the statute of limitations for plaintiffs' claims began to run in 1967 and was not later restarted. Because the applicable statute of limitations prevents plaintiffs from asserting causes of action that accrued before April 30, 1986, the trial court found their claims to be time-barred and granted summary judgment in favor of the Government.

### C.

With respect to the third group of nine claimants, the Court of Federal Claims applied the rule of *United States v. Dow,* 357 U.S. 17, 22, 78 S.Ct. 1039, 1044, 2 L.Ed.2d 1109 (1958), to the effect that a party may not maintain an action for inverse condemnation unless it owned the property at the time of the alleged taking. According to the trial court:

> Finally, a number of plaintiffs are not entitled to relief because they did not own property that is the subject of this litigation at the time of the alleged taking (April 30, 1986). The owner at the time the Government takes possession, rather than the owner at an earlier or later date, is the one who has the claim and is to receive payment. *Dow,* 357 U.S. at 22, 78 S.Ct. at 1044; *see also Martin v. United States,* 30 Fed. Cl. 542, 551, *aff'd,* 41 F.3d 1519 (Fed. Cir.1994) (table).

Order of Court of Federal Claims (July 20, 1995), pp. 11–12. Because none of the plaintiffs in the third group owned their property on April 30, 1986, the trial court granted summary judgment against them.

### III.

The Court of Federal Claims may grant summary judgment only if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

RCFC 56(c). On appeal, this court conducts a "complete and independent review" of the record to determine whether summary judgment is appropriate. *Tabb Lakes, Ltd. v. United States,* 10 F.3d 796, 799 (Fed.Cir. 1993) (citing *Trayco, Inc. v. United States,* 994 F.2d 832, 835 (Fed.Cir.1993)). In conducting this review, this court views the record "in the light most favorable to the party against whom summary judgment was granted." *Confederated Tribes of Colville Reservation v. United States,* 964 F.2d 1102, 1107 (Fed.Cir.1992).

## A.

■ For fifty years now, since the Supreme Court decided the seminal case of *United States v. Causby,* federal courts have repeatedly confirmed that the United States may convert private property to public use by its operation of aircraft. *See, e.g., United States v. Causby,* 328 U.S. 256, 263, 66 S.Ct. 1062, 1066, 90 L.Ed. 1206 (1946); *Griggs v. Allegheny County,* 369 U.S. 84, 88, 82 S.Ct. 531, 533, 7 L.Ed.2d 585 (1962); *Brown v. United States,* 73 F.3d 1100, 1102 (Fed.Cir. 1996).

Factually, *Causby* represents what may be viewed as the paradigm of overflight takings cases. In that case, the plaintiffs owned and occupied 2.8 acres of land near a military airport in North Carolina. 328 U.S. at 258, 66 S.Ct. at 1064. Various United States aircraft—bombers, transports, and fighters— frequently passed directly over the property at altitudes as low as 83 feet. *Id.* at 258–59, 66 S.Ct. at 1064–65. These overflights barely missed the tops of trees and structures on the property, and caused noise significant enough to deprive the family of sleep and make the property unsuitable for chicken farming, the plaintiffs' previous livelihood. *Id.* at 259, 66 S.Ct. at 1064. Crafting a flexible test that balanced the interests of the public against the interests of the private landowners, the Court granted the landowners compensation for their loss to the extent that the overflights were "so low and so frequent as to be a direct and immediate interference with the enjoyment and use of the land." 328 U.S. at 261, 263, 266–67, 66 S.Ct. at 1065, 1066, 1068–69.

Key to the Court's reasoning in *Causby* was the physical interference with the plaintiffs' use of their land:

> The path of glide for airplanes might reduce a valuable factory site to grazing land, an orchard to a vegetable patch, a residential section to a wheat field. Some value would remain. But the use of the airspace immediately above the land would limit the utility of the land and cause a diminution in its value.

*Id.* at 262, 66 S.Ct. at 1066. *See also Griggs,* 369 U.S. at 89, 82 S.Ct. at 533 (without some protection of superadjacent airspace, "no home could be built, no tree planted, no fence constructed, no chimney erected"). Subsequent federal cases set a rule, applied more or less in mechanical fashion, that the United States might be liable for flights below 500 feet in noncongested areas (or 1000 feet in congested areas), but that flights at higher altitudes did not interfere with the landowner's use of the surface. *See, e.g., Lacey v. United States,* 219 Ct.Cl. 551, 595 F.2d 614, 616 (1979) (treating 500 feet as line of demarcation between compensable and non-compensable overflights); *Aaron v. United States,* 160 Ct.Cl. 295, 311 F.2d 798, 801 (1963) (allowing claims based on flights below 500 feet, while denying those based on flights over 500 feet); *Matson v. United States,* 145 Ct.Cl. 225, 171 F.Supp. 283, 286 (1959) (allowing recovery for flights under 500 feet). These cases found support for the 500–foot rule in the regulatory definition of "navigable airspace," *see* 14 C.F.R. § 91.119(c), but other cases recognized that the United States may still take private property even where its overflights occur wholly within the "navigable airspace." *See Branning,* 654 F.2d at 101–02 (allowing recovery although the overflights were wholly within navigable airspace that the United States had a right to occupy); *Aaron,* 311 F.2d at 801 (recognizing possibility of recovery where "travel in the navigable air space [is] so severe as to amount to a practical destruction or a substantial impairment of [private property]"); *Matson,* 171 F.Supp. at 285 (finding a taking where flights were below 500 feet, but clearly within Congressionally-approved navigable airspace for takeoffs and landings).

Although federal courts have, by and large, required the facts of a case to match the *Causby* paradigm before allowing recovery, nothing in *Causby* or the intervening precedent limits a takings claim to only those facts. Indeed, overflight takings disputes defy *per se* rules or classification. *Cf. Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426, 102 S.Ct. 3164, 3170, 73 L.Ed.2d 868 (1982) ("[N]o 'set formula' exist[s] to determine, in all cases, whether compensation is constitutionally due for a government restriction of property. Ordinarily, the Court must engage in 'essentially ad hoc, factual inquiries.'" (citing *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978))). Rather, precedent requires, consistent with the purpose of the Takings clause, a remedy for government action that singles out a private landowner to bear a disproportionate burden for a public benefit. *See Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960) ("The Fifth Amendment's guarantee that private property shall not be taken for a public use without just compensation was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole."). Thus, while the facts, reasoning, and rules of *Causby* have always guided this corner of takings law, they do not imprison it.

This case requires this court to consider the viability of a takings claim based on frequent flights at low altitudes over and around the plaintiffs' property. The Argents allege that these flights are so noisy and so disruptive that they destroy, at least in part, the Argents' ability to use and enjoy their property. Specifically, the Argents allege that the rearward blast of the jets as the Navy planes corner destroys their enjoyment of their property even when the aircraft do not fly directly over their land. According to the Government, however, the Argents cannot base their claim on all the United States' flights around OLF Coupeville, but must base their claim solely on those flights passing directly overhead. For reasons discussed below, this court deems the Argents'

allegations sufficient to warrant factual consideration of their claim.

With the increased prominence of jet airplanes, noise and vibrations have replaced physical encumbrance as the primary complaint of claimants seeking compensation. *See Branning*, 654 F.2d at 101 (noting that "[t]he real source of interference with plaintiffs' use of their property in *Lacey* was not the altitude of the flights, but the noise"); *see also Highland Park, Inc. v. United States*, 142 Ct.Cl. 269, 161 F.Supp. 597, 600 (1958) (noting that prior to the introduction of jet airplanes, propeller-driven airplanes operating at the same altitudes were not such a nuisance). With sufficiently egregious factual showings, our predecessor court ordered compensation for the effects produced by jet aircraft, despite the claimant's inability to allege any flights under 500 feet. *See Branning*, 654 F.2d at 101–02 ("This is a case of first impression in which the court may consider the altitude of the flights over the property, but must give primary consideration to the effect of aircraft noise . . . .").

*Branning* involved military aircraft training exercises—not unlike those at issue in the present case—in which planes practiced noisy takeoff and landing operations designed to simulate landing on an aircraft carrier at sea. *Id.* at 91 n. 3. In one exercise, for example, groups of planes flew in "racetrack" loops to make ten loops around a landing strip, allowing ten touch-and-go landings on the airstrip before the planes required refueling. *Id.* As they passed over the claimant's property, the planes flew at an altitude of 600 or 1000 feet, depending on the particular exercise. *Id.* at 91–92. Although the planes were outside the 500 feet of airspace reserved to the landowner in noncongested areas, the court allowed recovery. *Id.* at 90 ("The novelty of this decision is in its holding that defendant's use of airspace at altitudes above 500 feet . . . may be a taking of land beneath *if the use is peculiarly burdensome.*" (emphasis added)). The court deemed the particularly noisy and intrusive character of the training exercises a "vital factor" in its decision. *Id.* at 90. The court also noted the singular burden imposed on landowners near the Navy's facility as com-

pared with all other landowners. *Id.* ("Defendant could have performed this exercise elsewhere but selected airspace over plaintiff's land for it because alternative locations were deemed even more objectionable."). The court acknowledged the general rule that flights over 500 feet did not constitute a taking, but permitted departure from this rule because of the peculiar burden imposed by the aircraft operations at issue.

The case presently before this court presents a similar situation. Here, as in *Branning,* the plaintiffs allege a peculiar burden imposed on landowners surrounding the site selected for Naval aircraft training. Field carrier landing practice involves groups of planes making passes over a landing strip at averages approaching fifty times a day. The record at this stage of the litigation suggests that this activity sometimes occurs as late as 1:00 in the morning. Although Dennis Argent's affidavit does not mention the altitude of flights, other record evidence indicates that flights reach low altitudes over adjacent properties. All of these operations allegedly cause "constant" noise and vibrations. These are not the ordinary incidents of life near an airport. *See Causby,* 328 U.S. at 266, 66 S.Ct. at 1068 ("The airplane is part of the modern environment of life, and the inconveniences which its causes are normally not compensable under the Fifth Amendment.").

■ The Argents do not allege, nor apparently can they, that all of the offending flights pass directly over their property. Instead, they allege that planes fly overhead "on occasion," but much more frequently they "corner" over adjacent properties, causing great disturbance on the Argents' property. The Government insists that this admission defeats the Argents' claim. The Government ascribes to takings jurisprudence an inflexibility that does not exist. The United States may take private property not only by physical occupancy, but also by imposing such burdens upon the use of property as to deprive the owner of the enjoyment of the land. *See United States v. General Motors Corp.,* 323 U.S. 373, 378, 65 S.Ct. 357, 359, 89 L.Ed. 311 (1945) ("Governmental action short of acquisition of title or occupancy has been held, if its effects are so com-

plete as to deprive the owner of all or most of his interest in the subject matter, to amount to a taking." (citations omitted)). While physical invasion of private property remains an especially notorious category of takings, *see Loretto,* 458 U.S. at 427, 102 S.Ct. at 3171 ("When faced with a constitutional challenge to a permanent physical occupation of real property, this Court has invariably found a taking."), the law is flexible enough to recognize non-invasive Governmental action that nonetheless threatens to destroy the owner's enjoyment of his estate.

The important case of *Richards v. Washington Terminal Co.,* 233 U.S. 546, 34 S.Ct. 654, 58 L.Ed. 1088 (1914) is instructive on this point. In *Richards,* the plaintiff sought compensation for the operation of railroad tracks and a tunnel near his property in the District of Columbia. *Id.* at 548, 34 S.Ct. at 655. As trains passed by on the tracks, they emitted smoke and exhaust that poured over the plaintiff's property. *Id.* at 549, 34 S.Ct. at 655. Further, the nearby tunnel contained an exhaust system that propelled smoke, dust, dirt, cinders, and gases directly towards the plaintiff's property. *Id.* These nuisances made the plaintiff's property inhospitable for occupancy and significantly less valuable. *Id.* at 549–50, 34 S.Ct. at 655–56. In analyzing the plaintiff's taking claim, the Supreme Court distinguished between public nuisances, borne by all owners of property adjoining a railroad, and private nuisances peculiar to a small number of landowners. *Id.* at 555, 34 S.Ct. at 657. With respect to the exhaust from trains passing on the tracks, the Court found this damage to be a public nuisance, and barred recovery for the plaintiff. According to the Court:

> [R]ailroads constructed and operated for the public use, although with private capital and for private gain, are not subject to actions in behalf of neighboring property owners for the ordinary damages attributable to the operation of the railroad, in the absence of negligence.... Any diminution of the value of property not directly invaded nor peculiarly affected, but sharing in the common burden of incidental damages arising from the legalized nui-

sance, is held not to be a "taking" within the constitutional provision.

233 U.S. at 553–54. However, with respect to exhaust from the tunnel, the Court discerned a peculiar burden imposed on the plaintiff, not shared by other landowners, by virtue of the placement of the tunnel near his property. *Id.* at 557–58, 34 S.Ct. at 658–59. According to the Court:

> The reasoning [of *Baltimore & Potomac R.R. Co. v. Fifth Baptist Church,* 108 U.S. 317, 2 S.Ct. 719, 27 L.Ed. 739 (1883)] proceeded upon the ground (p. 332) that no authority conferred by Congress would justify an invasion of private property to an extent amounting to an entire deprivation of its use and enjoyment, without compensation to the owner; … and hence that the legislative authorization conferred exemption only from suit or prosecution for the public nuisance, and did not affect "any claim of a private citizen for damages for any special inconvenience and discomfort not experienced by the public at large."

*Id.* at 556, 34 S.Ct. at 658 (quoting *Baltimore & Potomac R.R. Co. v. Fifth Baptist Church,* 108 U.S. 317, 2 S.Ct. 719, 27 L.Ed. 739 (1883)). The Court concluded that the smoke and exhaust from the tunnel were private nuisances borne peculiarly by the plaintiff, and therefore granted compensation. *Id.* at 557, 34 S.Ct. at 658.

■ A similar rule governs aircraft overflights. Where a plaintiff complains only of noise resulting from normal aircraft operations, not passing directly overhead, this court follows the general rules springing from *Causby* to deny recovery. *See Avery v. United States,* 165 Ct.Cl. 357, 330 F.2d 640, 645 (1964); *see also Batten v. United States,* 306 F.2d 580, 585 (10th Cir.1962) (holding that where aircraft operations did not physically invade the landowner's estate, incidental smoke, vibrations and noise were not compensable takings); *cf. Richards,* 233 U.S. at 554, 34 S.Ct. at 657 (absent physical invasion of the property, there can be no recovery for "noises and vibrations incident to the running of trains, the necessary emission of smoke and sparks from the locomotives, and similar annoyances inseparable from the normal and non-negligent operation

of a railroad"). However, where, as here, plaintiffs complain of a peculiarly burdensome pattern of activity, including both intrusive and non-intrusive flights, that significantly impairs their use and enjoyment of their land, those plaintiffs may state a cause of action. *Cf. Griggs,* 369 U.S. at 87, 82 S.Ct. at 532 (affirming that taking occurred even though some of the activities of which the plaintiff complained were near, but not over, the plaintiff's property); *Richards,* 233 U.S. at 557, 34 S.Ct. at 658 ("Construing the acts of Congress in the light of the Fifth Amendment, they do not authorize the imposition of so direct and peculiar and substantial a burden upon plaintiff's property without compensation to him."); *Branning,* 654 F.2d at 90 (finding that the United States took private land without violating the landowner's airspace because its overflights were "peculiarly burdensome" to the landowner).

The Argents are not before this court to complain of individual flights, which may or may not pass over their property. Rather, they complain of the entire course of operation at OLF Coupeville that entails hundreds of flights per week—an allegedly constant source of noise and disruption. If true, this activity is a peculiar burden imposed on the Argents and their neighbors by the United States' selection of a remote site for aircraft training operations. *See Branning,* 654 F.2d at 90 ("Defendant could have performed this exercise elsewhere but selected airspace over plaintiff's land for it because alternative locations were deemed even more objectionable. Thus, plaintiff was consciously singled out or selected to bear a burden which defendant also consciously elected not to impose on others, even others otherwise similarly situated."); *Richards,* 233 U.S. at 555–57, 34 S.Ct. at 657–58 (distinguishing between takings claims that allege merely a public nuisance, which are not compensable, and takings claims that allege "special inconvenience and discomfort not experienced by the public at large," which are compensable). The Government cannot defeat such a claim merely by pointing out that most of its flights do not pass over the Argents' land.

Of course, this court does not at this point pass on the sufficiency of the Argents' evi-

dence to demonstrate the alleged taking. The trial court retains the mission of finding and weighing the facts of this case. But insofar as the trial court would have denied the Argents the opportunity to present evidence for factual consideration, its decision cannot stand. Accordingly, this court vacates the grant of summary judgment against the Argents and remands for further proceedings consistent with this opinion.

### B.

■ To receive compensation for an alleged taking of private property by the Federal Government, a property owner must file suit within six years of the date on which the cause of action arose. See 28 U.S.C. § 2501; see also Fallini v. United States, 56 F.3d 1378, 1380 (Fed.Cir.1995), cert. denied, —— U.S. ——, 116 S.Ct. 2496, 135 L.Ed.2d 189 (1996). Failure to comply with this statute of limitations defeats jurisdiction in the Court of Federal Claims, see Jones v. United States, 801 F.2d 1334, 1335 (Fed.Cir.1986), and entitles the Government to continue the activity alleged to have constituted the taking. In effect, the Government obtains an easement over the property for that use. In this case, the plaintiffs filed their claim on April 29, 1992. Claims that accrued before April 29, 1986, therefore, are barred.

■ "The taking of an avigation easement by the Government occurs when the Government begins to operate aircraft regularly and frequently over a parcel of land at low altitudes, with the intention of continuing such flights indefinitely." Lacey, 595 F.2d at 618 (citations omitted). The United States may effect a second taking by, inter alia, increasing the number of flights, see Avery, 330 F.2d at 643, or introducing noisier aircraft, see Lacey, 595 F.2d at 619.

In the present case, the trial court found that the cause of action accrued, if at all, in 1967, when the Navy reactivated OLF Coupeville for carrier landing practice and began frequent flights over the Admiral's Cove area. The trial court reasoned:

> The Court concludes that when the Navy reactivated OLF Coupeville in 1967 for field carrier landing practices it intend-

ed to continue those flights indefinitely. This is evidenced by at least three undisputed facts. First, OLF Coupeville is a permanent facility with permanent structures that have been in continuous use since 1967. See Speir v. United States, 202 Ct.Cl. 1020, 1026, 485 F.2d 643, 648 (1973) (temporary air facility used for temporary period indicates temporary avigation easement). Second, the airfield has been used for tens of thousands of operations since the Vietnam War. Indeed, in one year after the war (1978) there were more operations than during the war (1971). Third, the record does not demonstrate that the Navy intended to close Coupeville at the end of the war. See id. (Army intended to use airfield "only so long as there was a heavy demand for Army helicopter pilots in Vietnam."). Rather, the record merely shows that the Navy reactivated the facility "as a result of the southeast asia situation." Dfd's Motion at Ex. 8 (memo to Asst. Secy. of Navy).

Order of Court of Federal Claims (July 20, 1995), p. 10.

Apparently undisputed facts in the record support the trial court's conclusion that in 1967 the Navy manifested an intent to continue permanent training operations at OLF Coupeville. In this regard, the construction of permanent training facilities and the continuation of flights after the end of the Vietnam War provided the plaintiffs with ample notice of a permanent taking well within six years of the date of the first flight. However, the inquiry does not end there, for the plaintiffs allege additional takings in the years after 1986. Thus, the inquiry turns on the scope of the pre–1986 easement. The Government urges measurement of the pre–1986 easement by the Vietnam-era operations (at levels as high as 39,246 per year). Under this view, the post–1986 operations would fall well within the scope of the Navy's permanent easement and no second taking could exist. According to the plaintiffs, however, the Navy set the scope of its permanent easement by its operations after 1971 (at levels ranging between 11,782 and 24,844 operations per year). Under the plaintiffs'

view, the Navy's post–1986 operations exceed the permissible scope of that easement.

▪ Viewed in the light most favorable to the plaintiffs, a perspective this court must adopt on review of summary judgment, the evidence creates a factual dispute. For example, a Navy memorandum indicated that the Commander, Fleet Air, recommended reactivation of OLF Coupeville for training "as a result of the Southeast Asia situation." Further, a contemporary press release informed the public that the Navy would reactivate OLF Coupeville "for an indeterminate period of time" and that "[w]hen this need no longer exists, action will be reinstituted to cede OLF Coupeville to Island County." Viewed from the vantage point of 1967, these facts provide support for the plaintiffs' contention that the level of operations during the Vietnam era were aberrant. Indeed, the tabulation of operations shows that the flights did, in fact, decrease significantly after the Vietnam War ended. These facts might have lulled plaintiffs into withholding their legal actions relative to the overflights in the belief that Vietnam-era flight levels were abnormally high. Thus, a full examination of the facts may show the plaintiffs to be correct that the proper timeframe for measuring the scope of the Navy's pre–1986 easement began in 1971, not 1967–1968.

The plaintiffs also show some evidence that the flight levels from 1971–1985 generally represented a lower level of activity than the levels for 1986 and later. The trial court rejected this argument on the grounds that the number of flights in 1978 exceeded the number in 1986. However, the average number of flights conducted between 1986 and 1991 (27,464) is higher than the average of any other six-year period after 1971. For example, flights between 1974 and 1979, the busiest six years between 1971 and 1985, averaged 21,040 per year. This analysis shows a busier flight schedule for the years after 1986 than for any comparable group of years before 1986. Accepting that the numbers may be parsed in different ways to support different conclusions, this court believes that the plaintiffs have proffered enough evidence to avoid summary judgment. At trial, the plaintiffs may be able to show that the Navy sufficiently increased the scope of its easement in the years after 1986. If so, the plaintiffs may be entitled to recovery.

Finally, the plaintiffs present some evidence that the noise levels from the Navy's operations increased dramatically around 1986. According to the plaintiffs, the increased flights and increased use of EA–6B aircraft (as opposed to the other aircraft flown at OLF Coupeville, the A–6) led to appreciably greater noise on the ground after 1986. The plaintiffs did show that the EA–6B is a larger aircraft with greater engine thrust than the A–6. They also produced a survey that compared ground noise produced by the EA–6B and the A–6 aircraft flying overhead. The survey showed the EA–6B aircraft noisier by five to ten decibels.* The plaintiffs also submitted affidavits attesting to personal observations that the EA–6B aircraft were noisier than the A–6 aircraft. The trial court discredited all this evidence in favor of the Navy's affiant, Richard Melaas, who compared the noise produced by the EA–6B and the A–6 and found them both quieter than the A–3, which the Navy used at OLF Coupeville until 1970. Additionally, the Government points to other evidence that tends to show that the EA–6B aircraft are quieter than the A–6 aircraft. However, the conflict between these factual presentations may not be resolved on summary judgment.

Moreover the trial court's reliance on the noise level of the A–3 assumes a fact in dispute, that is, whether the 1970–era activity was temporary or permanent. On plaintiffs' view of the facts, when both the number of flights and the noise associated with any single flight decreased in 1971, the plaintiffs may have been justified in concluding that the Vietnam-era activity was temporary, not permanent.

In sum, although the Government points this court to evidence that contradicts the plaintiffs' contentions on the scope of the

---

* A decibel is a unit for measuring sound pressure; it is based on a logarithmic scale, so that an increase of 10 decibels is an increase of a hundred times in sound pressure. That does not, however, equate with a comparable increase in perceived noise.

Navy's pre–1986 activity, the scope of the Navy's post–1986 activity, and the relative noise levels of various aircraft, it is improper at this stage of the proceedings for either the trial court or this court to choose one party's version of the facts over the other. Suffice it to say, the plaintiffs present sufficient evidence to raise a genuine issue with respect to material facts. At this stage of the proceedings, that ends the inquiry. This court vacates the summary judgment against the second group of plaintiffs and remands.

### C.

■ Absent a valid voluntary assignment of a compensation claim against the Government for the taking of property, *see United States v. Shannon,* 342 U.S. 288, 72 S.Ct. 281, 96 L.Ed. 321 (1952), the general rule is that "[t]he owner at the time [of the taking] rather than the owner at an earlier or later date, is the one who has the claim and is to receive payment." *United States v. Dow,* 357 U.S. 17, 22, 78 S.Ct. 1039, 1044, 2 L.Ed.2d 1109 (1958) (internal quotes omitted). The parties dispute the dates on which the various takings occurred. The plaintiffs in the trial court's third group acquired their properties at various times between 1986 and 1991. The trial court assumed that the takings occurred, if at all, on April 30, 1986—the outer limit of the six-year period of limitations.

■ The question of when a taking occurred is a factual matter that depends on matters such as when the alleged increase in flights and noise occurred. The Government points out that the plaintiffs' complaint alleges that the takings occurred "[i]n 1986." Plaintiff's Amended Petition, ¶ 5. This reading of the complaint seems overly technical, especially in light of factual allegations in the complaint and other pleadings clearly relying on post–1986 Navy statements and actions to establish the alleged takings. Fairly read, the complaint alleges a taking *on or after* April 30, 1986. Although some plaintiffs may ultimately be barred from recovery under the rule of *Dow,* that determination will have to await a more precise calculation of the date of the alleged takings. Thus, this court

vacates the summary judgment against the third group of plaintiffs and remands.

### IV.

In conclusion, this court holds outstanding factual disputes under the law as enunciated in this opinion preclude entry of summary judgment against all three groups of plaintiffs. Therefore, this court vacates the trial court's judgment and remands for further proceedings consistent with this opinion.

*VACATED AND REMANDED*